(Nos. 105789, 105851 cons.—

HECTOR ADAMES, JR., *et al.*, Appellees and Cross-Appellants, v. MICHAEL F. SHEAHAN, in His Official Capacity as Cook County Sheriff, Appellant and Cross-Appellee.—HECTOR ADAMES, JR., *et al.*, Appellees and Cross-Appellants, v. BERETTA U.S.A. CORPORATION, Appellant and Cross-Appellee.

*Opinion filed March 19, 2009.—Rehearing denied May 26, 2009.*

Daniel F. Gallagher, Terrence F. Guolee and Jennifer L. Medenwald, of Querrey & Harrow, Ltd., of Chicago, for appellant and cross-appellee Michael F. Sheahan, Cook County Sheriff.

Joseph F. Spitzzeri and Garrett L. Boehm, Jr., of Johnson & Bell, Ltd., of Chicago, and Craig A. Livingston, of Walnut Creek, California, for appellant and cross-appellee Beretta U.S.A. Corporation.

Michael W. Rathsack, of Chicago (James D. Montgomery, James D. Montgomery, Jr., Melvin L. Brooks and Adam M. Simon, of counsel), for appellees and cross-appellants.

Roger Huebner, of Springfield, and DeAno & Scarry, of Wheaton, for *amici curiae* Illinois Municipal League *et al.*

Charles M. Dyke, of Thelen Reid Brown Raysman & Steiner LLP, of San Francisco, California, for *amici curiae* Legal Community Against Violence *et al.*

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Garman, Karmeier, and Burke concurred in the judgment and opinion.

Justice Kilbride took no part in the decision.

## OPINION

On May 5, 2001, William (Billy) Swan accidentally shot and killed his friend Joshua (Josh) Adames while playing with his father's service weapon. At the time, Billy's father, David Swan, was employed by the Cook County sheriff's department as a correctional officer. Plaintiffs, Hector Adames, Jr., and Rosalia Diaz, as co-special administrators of the estate of Josh Adames, filed suit against numerous defendants. At issue in this case are plaintiffs' claims against defendant Michael F. Sheahan (Sheahan), in his official capacity as Cook County sheriff, and defendant Beretta U.S.A. Corporation (Beretta).

Following discovery, the trial court granted summary judgment in favor of defendants Sheahan and Beretta on their respective motions for summary judgment. The appellate court affirmed in part and reversed in part, and remanded the cause. 378 Ill. App. 3d 502. Both Sheahan and Beretta filed petitions for leave to appeal. 210 Ill. 2d R. 315(a). This court allowed both petitions and consolidated the cases. Plaintiffs also have filed a cross-appeal. 155 Ill. 2d R. 318.

## BACKGROUND

Numerous depositions were taken during discovery in this case. The evidence from those depositions will be

summarized here as necessary to our disposition of the case.

### Billy Swan's Testimony

On the morning of May 5, 2001, Billy Swan, who then was 13 years old, was home alone. Billy's mother was at work and his father, David, had taken Billy's brother to a movie. Billy called his friend Josh Adames and invited him over to play. Billy then went to his parents' bedroom to watch for Josh through the bedroom window. Billy knew that both going into his parents' bedroom and inviting friends over when no one else was home were against house rules.

While in his parents' bedroom, Billy noticed that the closet door was partially open. He saw a box on the top shelf of the closet, so he took the box down to see what was inside. Billy opened the box, which he said was unlocked, and saw three guns. One of the guns was a Beretta 92FS handgun, the gun at issue in this case. Billy had never seen his father carry a gun or clean a gun in the house, although he thought that his father might have a gun. Billy had never handled a gun before.

Billy picked up each gun and examined it. Billy said that the magazine or clip was in the Beretta. When Billy picked up the Beretta, he pushed a button that released the magazine. Billy could see the bullets in the magazine. Billy then put the magazine back in the Beretta. Billy moved the slide at the top of the gun and a bullet popped out. Billy again removed the magazine and put the bullet back in the magazine. Billy repeatedly removed and replaced the bullets and magazine from the gun. Billy knew that the Beretta was loaded when the magazine was in the gun, but thought it was unloaded when the magazine was taken out. He thought that the bullet came out of the top of the magazine when the handgun was fired, and did not know that a bullet remained in the chamber. Billy did not read the instruction manual for the Beretta.

After playing with the guns for several minutes, Billy saw his friend Michael riding his bike outside. Billy put the three guns in his pockets and went downstairs and opened the front door. Billy invited Michael in and showed him the guns. Billy jokingly told Michael that he was feeling "trigger happy" and that he was going to shoot Josh. Billy left the guns on the couch while he and Michael went in another room to play on the computer. Approximately 10 minutes later, Josh came over. Billy showed Josh the guns and the boys began playing around. While Billy was holding the Beretta, Josh tried to reach for it to take it out of Billy's hand. Billy pushed the button on the Beretta, took the magazine out and put it in his pocket. At this point, Josh was by the front door. Billy pretended that he was firing the gun, then pulled the trigger, discharging the gun. The gunshot was loud, causing Billy's ears to ring. Billy was afraid he would be in trouble if the neighbors heard the noise, so he ran upstairs and put the guns away.

When Billy came back downstairs, he saw Josh sitting against the door holding his stomach. Josh told Billy that he had been shot. Billy first thought that Josh was kidding, but when he moved Josh's hand, he saw a hole. Billy called 911 and told the dispatcher that he had found a gun and accidentally shot his friend while playing. Billy testified that he knew he was handling a real firearm and real ammunition when he shot Josh. Michael left as soon as the shooting happened.

Billy was found delinquent in juvenile court proceedings for the shooting and was placed on probation. The delinquency determination was based on a finding that Billy committed involuntary manslaughter (720 ILCS 5/9—3(a) (West 2000)), and reckless discharge of a firearm (720 ILCS 5/24—1.5(a) (West 2000)). The appellate court affirmed the delinquency finding. *In re W.S.*, No. 1—02—1170 (2003) (unpublished order under Supreme Court Rule 23).

David Swan's Testimony

David Swan graduated from the police academy in 1988 and was deputized with the Cook County sheriff's department around January 1988. From 1988 through 1997 or 1998, David worked corrections inside the Cook County jail, working a tier with approximately 48 to 60 inmates. David fed the inmates and did paper work and log books. David was promoted to a lieutenant in 1997 or 1998. As lieutenant, David's position was mainly administrative, doing paper work and scheduling and filling shifts. Until David was promoted to lieutenant, he carried a firearm to and from work most of the time, although he did not carry his gun while working on the jail tier. Rather, he would store his gun in the Division 5 Armory. He initially carried a Smith & Wesson .38 Special, but when he became certified in automatic weaponry, he began carrying the Beretta 92FS and kept the .38 Special as his personal weapon. David stopped carrying a weapon to work when he became a lieutenant. David testified that in 2001, he did not need a weapon in order to perform his job duties.

At the time of the shooting, David owned three firearms, the .38 Special, a .25 semiautomatic and the Beretta 92FS. The .25 semiautomatic was David's personal weapon and was never carried on the job. Although David no longer carried a gun once he was promoted to lieutenant, David kept his guns for his own protection and in case he was transferred to a different unit of the Cook County sheriff's office where he would again need a firearm. David's understanding was that, as a correctional officer, he was not required to respond to a crime by attempting to physically introduce himself into the crime or stop the crime. Rather, David understood that he was to call "911" to request a police response in the event he witnessed criminal activity.

On May 5, 2001, David took his younger son to the movies while his wife was at work. Billy did not want to

go to the movie. David told Billy that no one was allowed in the house. Billy said that he was going to the park to play. David testified that prior to May 5, 2001, the last time he had seen his guns was in the summer of 2000, when he completed his annual certification at the Cook County sheriff's gun range. After qualifying with the weapons, David cleaned them and locked them in his lockbox. David placed the lockbox with the guns in it on the top shelf of his bedroom closet. There were two keys to the lockbox. David kept one key on his key ring and one key in his top dresser drawer. David disagreed with Billy's testimony that the lockbox was not locked; however, for purposes of summary judgment, it was presumed that the lockbox was unlocked.

David understood that the sheriff's department required deputies to secure and store their weapons in either a locking box, like the one David used, or with a trigger lock. David testified that he stored the ammunition separately from the handgun, and stored the handgun without a bullet in its chamber, in accordance with department requirements. David was not aware that the Beretta would fire a bullet if the magazine was removed.

Following the shooting, Sheahan filed a complaint against David before the Cook County sheriff's merit board. The complaint alleged that each officer has a duty to safely store his weapon, that David did not do that, and that this failure allowed David's son to gain access to the weapon, which in turn resulted in Josh's death. The complaint noted that Sheahan's general order required the safe storage of weapons to avoid accidents. David's guns were taken from him by the police in the investigation and were never returned to him, although David was able to continue to work for the Cook County sheriff's office as a correctional officer after serving a suspension.

David also was charged pursuant to section 24—9 of the Criminal Code of 1961 (720 ILCS 5/24—9 (West 2000)), which prohibits improper storage of a firearm in a premise in which a minor under the age of 14 is likely to gain access to the firearm. David was found not guilty of the criminal charges.

### Sheahan's Office Rules and Policies

Sheahan's executive director and weapons training officers testified concerning Sheahan's orders and training instructions. Those orders and training instructions required all weapons to be locked up when stored at home. Weapons must be stored so they are inaccessible to children, and officers are taught to expect their children to look everywhere in their homes. At the time of Josh's shooting, Sheahan had a general order in place that mirrored or exceeded the requirements of section 24—9 of the Criminal Code of 1961 (720 ILCS 5/24—9 (West 2000)). The general order required officers to secure their duty weapons in a secured lockbox container or other location that would prohibit access by unauthorized persons, and to store keys to such lockboxes in a separate secure location. Sheahan's training also included materials on educating family members, particularly children, about gun safety. Officers are required to qualify in firearms annually, even if they do not own a weapon. Recertification included a program on home firearm safety.

Gerald O'Sullivan, retired executive director of the Cook County sheriff's office's training program, testified that Cook County sheriff's office correctional officers do not need a weapon to perform their duties. O'Sullivan said that only court deputies and sheriff's police officers need a weapon. The only authorized purpose for a correctional officer's duty firearm would be for external operations outside the jails. All sheriff's deputies receive

training to use their firearms, but it is a police officer that responds to an emergency on the street. Cook County sheriffs correctional officers are trained that unless someone's life is in danger, they are to call "911." Correctional officers never carry their duty weapons when they are at the jails, and do not have the responsibility to be ready to use their firearm to protect a person's life if it is in danger.

Similarly, Cook County sheriff's office retired Training Academy Chief Michael Ryan testified that correctional officers are not required to carry their weapons when they are off duty. Correctional officers are trained to call "911" and not to get involved in criminal situations, although Ryan testified that officers do have a duty to respond to forcible felonies occurring in their presence while off duty. In such a situation, a correctional officer would be permitted to use his duty firearm. Ryan further testified that when a correctional officer is at home, he is not expected to respond to crimes and is not required to keep his weapon available to him at all times when he is off duty. In fact, correctional officers are not required to own weapons.

Leroy Marcianik, range master of the firearms training division of the Cook County sheriff's department, testified that all sworn officers in Sheahan's office are required to be recertified in firearms on an annual basis. The officers are required to have a firearm that they can use in their annual recertification process. The process of recertification includes instruction on shooting, as well as issues concerning the safe storage of duty firearms. Officers that carry their firearms on a daily basis include the sheriff's police and some of the court services officers. Sheriff's correctional officers do not have to carry a weapon while on duty, nor do they have to carry a weapon when off duty.

## The Beretta 92FS

The Beretta 92FS is a semiautomatic nine-millimeter pistol. The instruction manual for the Beretta states that "[t]he Beretta 92FS semiautomatic pistol is primarily designed as a personal defense firearm for military and police use," and that "[i]t has become the choice of military and police forces throughout the world." The manual lists the Beretta's safety features, including: an ambidextrous safety-decocking lever; a firing pin unit; a hammer drop catch; an automatic firing pin catch; a chamber-loaded indicator, and a slide overtravel stop. The manual repeatedly cautions users to keep fingers off the trigger until ready to fire and to make sure the muzzle is pointing in a safe direction. The manual also warns that to prevent accidents due to wrongful unloading practice, the user should remember to remove the magazine and clear the chamber.

## Expert Testimony

Plaintiffs presented experts in their case against Beretta to testify that the Beretta 92FS was unreasonably dangerous. Stanton Berg, a firearms consultant, testified that a magazine disconnect device would have prevented the shooting in this case. The magazine disconnect was invented in 1910 and disables a semiautomatic pistol from firing when the magazine is removed. Berg testified that Beretta produced and sold Beretta 92 Series handguns with a magazine disconnect for use by police departments such as the Royal Canadian Mounted Police, the United States Veterans Administration and the correctional department of New York City. Berg noted more than 300 other models of handguns that incorporate a magazine disconnect safety, and testified that, in his opinion, any handgun without a magazine disconnect is defective. In addition, Berg testified that, in the absence of a magazine disconnect, the Beretta required a good chamber-loaded indicator. Berg said that the chamber-

loaded indicator on the Beretta 92FS was not sufficient to warn a user that the chamber had a bullet in it because the user could hardly see the indicator. Berg also believed that the Beretta required a warning on the weapon stating that it was capable of being fired with the magazine removed.

Wallace Collins, a firearms and ammunition design and safety expert, also testified on behalf of plaintiffs that the Beretta was unnecessarily dangerous. Collins stated that the Beretta required a magazine disconnect safety; a warning that the gun would fire when the magazine was removed; a marking to make plain what the chamber-loaded indicator means; a chamber-loaded indicator in an optimum position; and a key lock. Collins testified that the chamber-loaded indicator on the Beretta was not well designed. Collins said that the safety features required were readily available, inexpensive, and commercially feasible.

Professor Stephen Teret testified on behalf of plaintiffs as an expert in injury epidemiology. Teret was a professor of epidemiology for the School of Public Health at Johns Hopkins University. Teret testified concerning a survey designed by the Johns Hopkins Center for Gun Policy and Research, reported in the Journal of Public Health Policy. The survey asked respondents whether they thought that a pistol can be shot when the magazine is removed. Out of 1,200 respondents, 65% said that the pistol could be fired if the magazine was removed, 20.3% thought that a pistol could not be discharged after the magazine was removed, 14.5% did not know, and 0.2% refused to answer. Of those that answered either that the pistol could not be discharged after the magazine was removed or that they did not know, 28% lived in a gun-owning household. Teret testified that the absence of a magazine disconnect caused Josh's shooting. Teret further testified that the chamber-loaded warning on the

Beretta was not effective. Teret's opinion was that the chamber-loaded warning did not convey that the handgun was loaded.

Beretta's witnesses testified that Beretta has manufactured handguns with magazine disconnects, which adds at most $10 to the $500 price of the gun. Beretta's witnesses agreed that the shooting in this case would not have happened if a magazine disconnect safety had been installed on the gun. Beretta did not include a magazine disconnect safety feature on the Beretta 92FS because there was no market demand for that feature. Beretta's witnesses also testified that for the past 20 years, the vast majority of law enforcement agencies have consistently expressed a preference for no magazine disconnect safety or internal locking device. Law enforcement officers and agencies do not want weapons that may become inoperable by an inadvertent release of the magazine, which could possibly jeopardize the safety of officers and the public.

### The Complaint and Summary Judgment

With regard to Sheahan, plaintiffs' third amended complaint contained a wrongful-death claim and a survival claim. Plaintiffs alleged that Sheahan assumed and exercised control over David Swan as Sheehan's employee and servant with regard to the safe and secure handling and storage of David's duty firearm and ammunition. Plaintiffs alleged, *inter alia*, that David Swan negligently stored his firearm, as well as his ammunition, in a manner that allowed his 13-year-old son to gain access to it; negligently failed to store his firearm in a separate location from the ammunition; negligently failed to childproof the firearm by securing it with a locking device; negligently failed to lock the container in which he stored his firearms; and negligently provided insufficient, as well as inappropriate, firearm instruction to Billy.

Plaintiffs alleged that, as a result of one or more of David's negligent acts, Billy accessed David's firearm and bullets, and used the firearm to shoot and kill Josh. In addition, the wrongful death of Josh was proximately caused by David's negligence in the course of his employment as a deputy Cook County sheriff, while motivated to serve Sheahan's interests and the terms of David's employment. Plaintiffs asserted that Sheahan was vicariously liable for David's negligent acts and/or omissions in the scope of his employment as an officer of the Cook County sheriff's office, both at common law and pursuant to statute.

Sheahan moved for summary judgment on the ground that the shooting did not occur within the course and scope of David's employment as a Department of Corrections officer, that Sheahan owed no duty to Josh, and that the storage of the gun was at most a condition and not the cause of the shooting. In the alternative, Sheahan argued that if the court determined that David's storage of the gun was within the course and scope of David's employment, Sheahan was immune from suit pursuant to sections 2—109, 2—201, and 2—204 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2—109, 2—201, 2—204 (West 2000)).

In addressing Sheahan's motion for summary judgment, the trial court held that Sheahan's arguments concerning weapon storage and scope of employment presented questions of fact sufficient to preclude summary judgment. However, the trial court found that the issue of whether Sheahan owed a duty to protect Josh from the criminal acts of Billy was dispositive. The trial court noted that Billy had been convicted of involuntary manslaughter and reckless discharge of a firearm, and had been adjudicated a delinquent minor. Citing *Estate of Johnson v. Condell Memorial Hospital*, 119 Ill. 2d 496

(1988), the trial court noted that Illinois law does not impose a duty to protect another from a criminal attack by a third person unless the criminal attack is reasonably foreseeable and the parties have a special relationship. The trial court held that Sheahan and Josh had no special relationship that would impose a duty on Sheahan to protect Josh from Billy's criminal act. The trial court further held that even if Sheahan, through his agent David Swan, owed a duty to Josh, there was no proximate cause because the cause of harm to Josh was not reasonably foreseeable. The trial court therefore entered summary judgment in favor of Sheahan.

With regard to Beretta, plaintiffs' third amended complaint contained claims for product liability design defect, negligent design, failure to warn, and breach of the implied warranty of merchantability. Specifically, plaintiffs alleged that the Beretta was inherently dangerous and defective because it did not incorporate safety features, including: a magazine disconnect safety that would prevent the gun from being fired if the magazine is removed; an effective chamber-loaded indicator to make users aware of when a bullet is loaded into the gun's chamber; and other safety devices such as a built-in lock, a child-resistant manual safety, a grip safety, and personalized gun technology that would have prevented unauthorized users, such as children, from firing the gun.

Plaintiffs also alleged that the gun was defective because it did not include adequate warnings concerning the foreseeable use of the gun by unauthorized persons, including children. Plaintiffs asserted that the defects included a failure to warn that: the gun may be loaded and can be fired even if the magazine is empty or disconnected from the gun; that the gun is loaded when there is red showing on the extractor; that the gun is loaded when the extractor is protruding; that the gun can be

fired by children and other unauthorized users; that the gun automatically loads bullet cartridges into the gun's chamber after being fired or after the gun is released from a lockback position; and that the gun should not be used or stored without additional safety devices.

In its summary judgment motion, Beretta argued that its product was not unreasonably dangerous, and that the Beretta 92FS performed as safely as ordinary consumers of firearms would expect. Beretta also argued that it had no duty to warn because the dangers of pointing a firearm at another human being and pulling the trigger are open and obvious. Finally, Beretta contended that Billy's actions were an intervening and superceding cause.

The trial court granted Beretta's motion in its entirety, "based upon the record" and "for all the reasons stated by Defendant Beretta and all relevant law."

### The Appellate Court

Plaintiffs then appealed the trial court's orders. The appellate court affirmed in part and reversed in part. 378 Ill. App. 3d 502. With regard to Sheahan, plaintiffs argued that the trial court erred in finding that Sheahan owed no duty to Josh, and in finding that Billy's conduct was criminal and was an independent intervening cause of Josh's injury. Plaintiffs argued that because the trial court relied on its finding that Billy's actions were criminal, it failed to examine the proper factors to determine whether one party owes a duty to another. Plaintiffs further argued that the trial court erred in finding that a criminal attack even occurred, as the testimony established that the shooting was an accident.

In addressing plaintiffs' arguments, the appellate court stated that because plaintiffs sought damages against Sheahan based on the principle of *respondeat superior*, it would address scope of employment, even though the trial court denied Sheahan's motion on that

issue. 378 Ill. App. 3d at 515. The appellate court found that the facts in this case were similar to the facts in *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41 (1998), so that *Gaffney* was controlling. 378 Ill. App. 3d at 517. Based upon *Gaffney*, the appellate court found that the facts supported a finding that David was acting within the scope of his employment, and that Sheahan was liable for David's allegedly tortious acts. 378 Ill. App. 3d at 518.

The appellate court next considered whether Billy's actions foreclosed a duty on the part of Sheahan to Josh. The appellate court took issue with the trial court's characterization of the proceedings against Billy as a conviction. The appellate court noted that Billy was adjudicated delinquent pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 2000)) and that a juvenile adjudication is not a "conviction" as defined under the Criminal Code of 1961 (720 ILCS 5/2—5 (West 2000)). 378 Ill. App. 3d at 518. Therefore, Billy was not convicted of a crime. 378 Ill. App. 3d at 519. Further, because Billy did not intend to hurt Josh, there was a question of material fact of whether Billy's actions were accidental or reckless. 378 Ill. App. 3d at 519. Accordingly, the appellate court held that the trial court erred in finding that Billy's actions were a criminal attack that foreclosed Sheahan's duty to Josh. 378 Ill. App. 3d at 519.

The appellate court also disagreed with the trial court's finding that this incident was not reasonably foreseeable for purposes of summary judgment. 378 Ill. App. 3d at 519. The court based its finding on the fact that David stored his Beretta next to ammunition in an unlocked storage case, in an unlocked closet accessible to a 13-year-old boy. The court also noted the evidence concerning Sheahan's awareness of these types of incidents. Moreover, there was sufficient evidence in the

record to establish the additional duty factors of the likelihood of injury, the magnitude of the burden to guard against the injury, or the consequences of imposing that burden. 378 Ill. App. 3d at 520.

Finally, the appellate court noted that Sheahan had raised sections 2—109, 2—201 and 2—204 of the Tort Immunity Act (745 ILCS 10/2—109, 2—201, 2—204 (West 2000)) as affirmative defenses to the complaint. The appellate court noted that the trial court did not address the tort immunity issue, and in remanding, stated that its finding that Sheahan was liable under the doctrine of *respondeat superior* did not end the immunity analysis, as the existence of a duty and the existence of an immunity are distinct issues that must be analyzed separately. 378 Ill. App. 3d at 534.

With regard to Beretta, the appellate court similarly held that the trial court erred in finding that Billy's actions were an independent intervening cause that superseded Beretta's legal responsibility. 378 Ill. App. 3d at 523. Rather, proximate cause in fact was shown because the shooting would not have occurred if the handgun had been properly stored, and it was reasonably foreseeable that this type of harm would occur if the handgun was not properly stored. 378 Ill. App. 3d at 523. The appellate court did affirm the trial court's finding that the Beretta was not unreasonably dangerous or defectively designed under both the consumer expectation test and the risk-utility test for product liability claims. 378 Ill. App. 3d at 526, 528. However, the appellate court reversed the trial court's finding that Beretta did not have a duty to warn. The appellate court held that plaintiffs' failure to warn claim presented a question of fact sufficient to survive summary judgment. 378 Ill. App. 3d at 530.

Finally, the appellate court addressed Beretta's argument that plaintiffs' lawsuit against it should be dis-

missed pursuant to the recently enacted Protection of Lawful Commerce in Arms Act (PLCAA or the Act) (15 U.S.C. §§7901 through 7903 (2006)). The appellate court noted that, pursuant to the PLCAA, plaintiffs must show that they fall within the exceptions to the Act in order to avoid its provisions. 378 Ill. App. 3d at 533. The appellate court held that plaintiffs failed to show that their claims fell within the PLCAA's exceptions for negligent entrustment or negligence *per se,* and for breach of contract or warranty. 378 Ill. App. 3d at 533. The appellate court held that the only exception that applied in this case is the exception for claims alleging a defect in design or manufacturing, absent a volitional criminal act. 378 Ill. App. 3d at 533-34. The appellate court stated that whether Billy's actions were criminal or unlawful was a question of fact for the trier of fact. If Billy's actions were found to be criminal, the PLCAA would foreclose plaintiffs' claims against Beretta. However, if Billy's actions were found to be purely accidental, the section 7903(5)(A)(v) exception to the PLCAA would apply and the PLCAA would not preclude plaintiffs' claims against Beretta. 378 Ill. App. 3d at 534.

## ANALYSIS

This case comes before us on the grant of summary judgment in favor of defendants. The purpose of summary judgment is to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment is proper only where "the pleadings, depositions, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2000). In determining whether a genuine issue of material fact exists, the pleadings, depositions, admissions and affidavits must be construed strictly against the movant

and liberally in favor of the opponent. *Adams*, 211 Ill. 2d at 43. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Summary judgment is a drastic means of disposing of litigation and, therefore, should be granted only when the right of the moving party is clear and free from doubt. *Adams*, 211 Ill. 2d at 43. This court reviews an order granting summary judgment *de novo*. *Adams*, 211 Ill. 2d at 43.

### Sheahan's Appeal

Sheahan argues that the trial court properly granted summary judgment in his favor because he had no duty to protect Josh from a criminal attack. Sheahan contends that no special relationship existed between Sheahan and Josh that would give rise to a common law duty to warn or protect Josh from harm. Moreover, Sheahan did not voluntarily undertake to protect Josh from third-party criminal attacks, which would fit within the exception to the special relationship rule.

Sheahan also argues that the appellate court's decision extends *respondeat superior* liability to unreasonable and impermissible bounds. Sheahan maintains that David was not acting within the scope of his employment at the time that he stored the Beretta.

Finally, Sheahan argues that summary judgment in his favor also is warranted because the manner in which David's Beretta was stored was not the proximate cause of Josh's shooting. Rather, the manner in which the Beretta was stored merely furnished a condition that made the shooting possible.

In response, plaintiffs deny that their claim involves special relationships or preventing criminal attacks. In fact, plaintiffs argue that there was no criminal attack in this case, because Billy did not intend to shoot or harm

anyone, and was not convicted of a criminal offense, but was only adjudicated delinquent. Plaintiffs also deny that they alleged a voluntary undertaking. Rather, plaintiffs' allegations of duty are premised on common law and statutory grounds. Plaintiffs claim that Sheahan owed a duty under common law and statute to secure the handgun. Further, plaintiffs contend that the shooting in this case was foreseeable.

With regard to *respondeat superior*, plaintiffs argue that the issue is not properly before this court because it was not an issue in the appellate court. Although the appellate court addressed scope of employment, plaintiffs assert that because scope of employment was not at issue, that portion of the opinion was *dicta*. Assuming, *arguendo*, the issue is properly before this court, plaintiffs contend that David was acting within the scope of his employment. Plaintiffs note that Sheahan required David to keep his weapon secured at home, which demonstrates that Sheahan controlled David's use of the Beretta during off-duty hours. Further, Sheahan could regulate David's storage of the weapon only if David was acting within the scope of his employment. In addition, the fact that Sheahan filed charges against David before the Cook County sheriff's merit board, alleging a violation of the sheriff's rules concerning weapon storage, establishes that David was acting within the scope of his employment. Plaintiffs maintain that Sheahan would have no authority to discipline David if David was not acting in the scope of his employment.

We first address plaintiffs' claim that the issue of *respondeat superior* is not properly before this court. It is well settled that when the appellate court reverses the trial court, and the appellee in the appellate court brings the case to this court for further review, that party may raise any questions properly presented by the record to sustain the judgment of the trial court, even if those

questions were not raised or argued in the appellate court. *In re R.L.S.*, 218 Ill. 2d 428, 437 (2006). In Sheahan's motion for summary judgment in the trial court, in addition to raising arguments concerning duty, proximate cause and tort immunity, Sheahan argued that he was entitled to summary judgment because the shooting did not occur within the course and scope of David's employment. As noted, the trial court granted summary judgment in favor of Sheahan based on its finding that Sheahan owed no duty to Josh. Plaintiffs then appealed that finding. In addressing the trial court's finding that Sheahan owed no duty to Josh, the appellate court addressed the issue of *respondeat superior*. Sheahan then raised the issue of *respondeat superior* in his petition for leave to appeal and brief in this court. Accordingly, it is clear that the issue of *respondeat superior* is properly before this court.

We next address the merits of the appellate court's finding that David was acting within the scope of his employment when he stored his weapon, as a finding that David was not acting within the scope of his employment would be dispositive. In general, a person injured by the negligence of another must seek his remedy from the person who caused his injury. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007). However, the relationship of employer and employee sets forth an exception to the general rule. *Bagent*, 224 Ill. 2d at 163. Pursuant to the theory of *respondeat superior*, an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment. *Bagent*, 224 Ill. 2d at 163. Under *respondeat superior*, an employer's vicarious liability extends to the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of employment. *Bagent*, 224 Ill. 2d at 163-64.

Illinois courts look to the Second Restatement of Agency (the Restatement) for guidance in determining

whether an employee's acts are within the scope of employment. *Bagent*, 224 Ill. 2d at 164. The Restatement identifies three general criteria used in determining whether an employee's acts are within the scope of employment. The Restatement provides:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master ***[.]
***

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Restatement (Second) of Agency §228 (1958).

This court has held that all three criteria of section 228 must be met in order to conclude that an employee was acting within the scope of employment. *Bagent*, 224 Ill. 2d at 165. It is plaintiff's burden to show the contemporaneous relationship between the tortious act and the scope of employment. *Bagent*, 224 Ill. 2d at 165.

With regard to the scope of employment issue, the appellate court held that this case was controlled by its decision in *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41 (1998), and, therefore, that David was acting within the scope of his employment. 378 Ill. App. 3d at 517. In *Gaffney*, a patrolman employed by the Chicago police department came home from work, unloaded his revolver, and placed the revolver and the bullets in an unlocked metal cabinet near the stairway leading to his basement. *Gaffney*, 302 Ill. App. 3d at 44. The officer's minor son later took the revolver and bullets to a party, and shot and killed a boy. *Gaffney*, 302 Ill. App. 3d at 44. The plaintiff sued the officer for negligent storage of his weapon, and sued the City of Chicago under a *respondeat*

*superior* theory. *Gaffney*, 302 Ill. App. 3d at 43. A jury found both defendants liable, and in answer to a special interrogatory, found that the officer was acting within the scope of his employment when he stored the weapon. *Gaffney*, 302 Ill. App. 3d at 43. The circuit court granted the City's motion for judgment notwithstanding the verdict on the ground that the officer was not acting within the scope of his employment at the time he stored the gun at his home. *Gaffney*, 302 Ill. App. 3d at 43-44.

On appeal, the appellate court reversed. The appellate court noted that the officer had testified that he was required to own a gun; that he would not be allowed to report for work if he did not have a gun; and that he brought his guns and bullets home every day because the police department did not provide him with a locker in which to store his weapon at work. *Gaffney*, 302 Ill. App. 3d at 46. The officer also testified that he did not lock the cabinet or the gun because his life had been threatened several times and " 'because I'm a Chicago police officer. If I heard someone screaming, would I have time to get that gun, I don't know. Would I attempt to, hopefully.' " *Gaffney*, 302 Ill. App. 3d at 46. In addition, the officer stated that as a Chicago police officer, he was required to respond to emergencies at all times, even if not on duty, and that he sometimes might need a gun to respond effectively to an emergency if he had it readily available. *Gaffney*, 302 Ill. App. 3d at 46.

With regard to the three criteria set forth in the Restatement, the appellate court held that the officer's storage of the gun at home was incidental to the requirement of his employment that he respond to any emergency that occurs in his presence. *Gaffney*, 302 Ill. App. 3d at 51. The appellate court acknowledged that normally at-home storage of one's personal effects would likely be considered an act of a personal nature, but in this case the police department both trained its officers in off-duty

weapon storage and could discipline officers for improper safeguarding of weapons while off duty. *Gaffney*, 302 Ill. App. 3d at 52.

The appellate court next held that the officer's conduct occurred substantially within the authorized time and space limits of the employment, although the appellate court also concluded that "the fact that conduct occurred outside the time and space limits is not dispositive." *Gaffney*, 302 Ill. App. 3d at 52. The appellate court recognized that the officer was off duty when he stored his weapon, but noted that with respect to emergencies, the officer was "on call" 24 hours a day. *Gaffney*, 302 Ill. App. 3d at 53. Therefore, it was not unreasonable to conclude that the time and space of the officer's employment were unlimited with respect to actions incidental to his response to an emergency. *Gaffney*, 302 Ill. App. 3d at 53.

Finally, the appellate court held that the officer's conduct was motivated, at least in part, by a desire to serve his employer. The appellate court based its finding on the fact that one of the reasons the officer kept the gun and cabinet unlocked was because he might need it in the event of an emergency. *Gaffney*, 302 Ill. App. 3d at 54. Further, the fact that the officer stored the gun in contravention of the police department's recommendations did not establish that the storage was outside the scope of employment. *Gaffney*, 302 Ill. App. 3d at 55. The appellate court therefore held that the officer was acting within the scope of his employment when he stored his gun.

Relying on *Gaffney*, the appellate court in this case held that David's storage of the gun was incidental to his employment. 378 Ill. App. 3d at 517. The appellate court noted that officers stored their weapons at home and received specific training and materials on proper storage. 378 Ill. App. 3d at 517. In addition, Sheahan

disciplined officers for improper storage. 378 Ill. App. 3d at 517. The appellate court acknowledged that David did not carry his weapon to work daily, nor did he store it unlocked in order to respond to any emergency in his presence. 378 Ill. App. 3d at 517. Nonetheless David testified he owned the firearm because of his job and was annually certified to use the firearm, as required by Sheahan. 378 Ill. App. 3d at 517.

The appellate court also held that David was acting within the authorized time and space limits of his employment. 378 Ill. App. 3d at 517. The appellate court noted that officers were expected to store their weapons at home and, although David testified that he did not carry his gun to work, he did testify that, at one time, he owned the gun for work purposes. 378 Ill. App. 3d at 517-18. In addition, David would be required to use the gun in an emergency, was certified annually to use the firearm, and was disciplined by Sheahan for improper storage. 378 Ill. App. 3d at 517-18. The appellate court did not discuss whether David's conduct was motivated, at least in part, by a desire to serve his employer. The appellate court concluded that David was acting within the scope of his employment and that Sheahan was liable for David's alleged tortious acts. 378 Ill. App. 3d at 518.

At the outset we note that the appellate court erred in not addressing whether David's conduct was motivated, at least in part, by a desire to serve his employer. As noted, this court in *Bagent* held that all three criteria must be met to conclude that an employee was acting within the scope of employment. *Bagent*, 224 Ill. 2d at 165. For the same reason, we find that the appellate court in *Gaffney* erred in holding that the second criteria— whether the conduct occurred substantially within the authorized time and space limits of the employment— was relevant but not dispositive. See *Gaffney*, 302 Ill. App. 3d at 52 ("the fact that conduct occurred outside

the time and space limits is not dispositive"). We again emphasize that all three criteria of section 228 must be met in order to find that an employee was acting within the scope of employment.

Turning to the substance of the appellate court's ruling, we find that the appellate court erred in finding that David was acting within the scope of his employment and that Sheahan is liable for David's tortious acts. Contrary to the appellate court's conclusion, this case is factually distinguishable from *Gaffney*.

In contrast to *Gaffney*, David testified that he was not required to own a gun and did not need to carry a gun to work once he was promoted to lieutenant in 1997 or 1998. David testified that he did not get rid of his guns, even though he did not carry a weapon in performing his duties, because he wanted the guns for protection and in case he was transferred to a different position where he would need a weapon. In fact, the last time David had seen or touched the Beretta prior to the May 5, 2001, shooting was in the summer of 2000, when David did his yearly qualification with the sheriff's department at the firing range. David also testified that when he was off duty, he was not required to respond to a crime by attempting to stop the crime himself. Rather, his duty was to call 911 and report the crime to the proper authorities.

Gerald O'Sullivan, Michael Ryan and Leroy Marcianik confirmed that correctional officers are not required to carry a weapon when they are off duty, and in fact do not need a weapon to perform their duties. Correctional officers also are not required to respond to emergencies when they are off duty, and are not required to keep their weapons available at all times.

Based on the preceding testimony, we find as a matter of law that none of the three general criteria for determining whether an employee's acts are within the

scope of employment have been met in this case. With regard to the first criteria, David's negligent storage of his guns was not the kind of conduct David was employed to perform, nor was it incidental to his employment. The appellate court found David's negligent storage of the gun was incidental to his employment because there was testimony that officers stored their guns at home, Sheahan trained officers on proper storage, and Sheahan disciplined officers for improper storage. While these facts might support a finding that David was acting within the scope of his employment if David was required to carry a gun at work like the officer in *Gaffney*, the fact remains that at the time Billy shot Josh, David was not required to, and did not, carry a gun as part of his employment.

The appellate court also found significant David's testimony that he owned the weapon because of his job and that he was annually certified to use the firearm pursuant to Sheahan's requirements. David testified, however, that Cook County sheriff's officers were required to annually qualify with firearms even if they do not own a weapon. Moreover, while it is true that David purchased the Beretta in connection with his job, the Beretta was purchased at a time when David carried a gun back and forth to work every day. David stopped carrying a gun to work when he became a lieutenant in 1997 or 1998. At that point, David was not required to keep the Beretta for purposes of his employment, but chose to do so. Contrary to the appellate court's finding, none of these facts establish that David's negligent storage of his weapon was in the performance of his employment or incidental to his employment.

For the same reasons, David's negligent storage of the gun was not within the authorized time and space limits of his employment. Unlike the police officer in *Gaffney*, David was not on call 24 hours a day, was not

required to respond to emergencies at all times, and was not required to respond to a crime by attempting to stop the crime himself. In contrast to *Gaffney*, David's employment was not unlimited with respect to actions incidental to his response to an emergency. Consequently, even under the most liberal interpretation of the time and space requirement, it is clear that David's negligent storage of the gun in this case was not within the scope of his employment.

Similarly, there is no evidence that David was motivated, at least in part, by a desire to serve his employer when he negligently stored his gun. As noted, the appellate court in this case did not address this factor in its *respondeat superior* analysis. *Gaffney* held that the officer's conduct in negligently storing his weapon was motivated, at least in part, by a desire to serve his employer, because one of the reasons the officer kept the gun and cabinet unlocked was because he might need it in the event of an emergency. *Gaffney*, 302 Ill. App. 3d at 54. *Gaffney* acknowledged that the officer also testified that he kept the gun and cabinet unlocked in order to protect his family, but noted that the third criteria in the *respondeat superior* analysis is satisfied as long as the employee is motivated in part by a desire to serve the employer, even if he is also motivated by personal considerations.

Here, in contrast, there was no evidence that David's negligent storage of the gun was motivated, at least in part, by a desire to serve Sheahan. As discussed, David did not keep the Beretta unlocked in order to respond to an emergency. David kept the Beretta, and thus stored the Beretta, for his own protection and in case he needed it in the future.

Although summary judgment is generally inappropriate when scope of employment is at issue, if no reasonable person could conclude from the evidence that an

employee is acting within the course of employment, a court should hold as a matter of law that the employee was not so acting. *Bagent*, 224 Ill. 2d at 170-71. Here, no reasonable person could conclude from the evidence that David was acting within the scope of his employment when he negligently stored his weapon. Consequently, Sheahan was entitled to summary judgment in his favor on the issue of *respondeat superior*. The appellate court erred in finding that David was acting within the scope of employment and that Sheahan was thereby liable for David's allegedly tortious acts.

Because we find that Sheahan was entitled to summary judgment based upon *respondeat superior*, there is no need to address Sheahan's remaining arguments concerning duty and proximate cause, nor do we need to remand to the trial court for consideration of Sheahan's immunity claims.

### Beretta's Appeal

Plaintiffs' claim against Beretta contained counts alleging design defect, failure to warn, and breach of the implied warranty of merchantability. As noted, the trial court granted summary judgment in favor of Beretta on all of plaintiffs' claims. Plaintiffs appealed the dismissal of their design defect and failure to warn claims, arguing that the trial court erred in holding that the handgun was not unreasonably dangerous for failing to include a magazine disconnect, or a sufficient chamber-loaded indicator, and in finding that Beretta had no duty to warn. Plaintiffs also asserted that the trial court erred in finding that Billy's conduct was an independent intervening cause superceding Beretta's legal responsibility.

As noted, the appellate court affirmed in part and reversed in part. The appellate court affirmed the trial court's finding that the Beretta was not unreasonably dangerous or defectively designed. However, the appellate court did find that plaintiffs' failure to warn claim

presented a question of fact, so that summary judgment was improperly entered in favor of Beretta on that claim.

The appellate court also addressed whether the PLCAA required dismissal of plaintiffs' lawsuit against Beretta. The PLCAA was enacted on October 26, 2005, two months after the trial court entered summary judgment in favor of defendants, and applied retroactively to prohibit civil suits against manufacturers, importers, distributors, and dealers of firearms or ammunition products, for harms solely caused by the criminal or unlawful misuse of firearm products or ammunition products that function properly as designed and intended. See 15 U.S.C. §§7901(a)(3), (b)(1), 7902 (2006). The appellate court held that the PLCAA applied to plaintiffs' lawsuit against Beretta, and therefore plaintiffs' cause of action was barred unless the remaining failure to warn claim fit within one of the Act's six exceptions. 378 Ill. App. 3d at 533.

The appellate court found that there was a question of fact concerning whether plaintiffs' failure to warn claim fit within the section 7903(5)(A)(v) exception. That exception allows for claims alleging a defect in design or manufacturing absent a volitional criminal act. In so holding, the appellate court rejected plaintiffs' claim that the PLCAA was unconstitutional because it violated the tenth amendment to the United States Constitution (U.S. Const., amend. X). 378 Ill. App. 3d at 533.

In this court, Beretta argues that the appellate court erred in finding that Beretta had a duty to warn. Beretta contends that the danger of pointing a gun at another person and pulling the trigger is open and obvious, even if the person pointing the gun mistakenly believes that the gun is not loaded. In addition, the appellate court ignored the fact that Beretta did provide numerous warnings, any one of which would have prevented Josh's shooting if read and heeded. Beretta also argues that the

appellate court erred in holding that plaintiffs' failure to warn claim fit within the exception for manufacturing and design defect claims set forth in the PLCAA.

We first address Beretta's claim that the PLCAA bars plaintiffs' sole remaining claim against Beretta. Whether plaintiffs' failure to warn claim is barred by the PLCAA presents a question of statutory interpretation, which is a question of law. Accordingly, our review is *de novo*. *People v. Lucas*, 231 Ill. 2d 169, 173-74 (2008).

One of the purposes of the PLCAA is:

> "To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. §7901(b)(1) (2006).

To that end, the PLCAA provides that "[a] qualified civil liability action may not be brought in any Federal or State court" (15 U.S.C. §7902(a) (2006)) and a "qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending" (15 U.S.C. §7902(b) (2006)).

A "qualified civil liability action" is:

> "a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party ***." 15 U.S.C. §7903(5)(A) (2006).

A "qualified product" means a firearm, or ammunition, or a component part of a firearm or ammunition, "that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. §7903(4) (2006).

The appellate court in this case did not address whether plaintiffs' lawsuit was a qualified civil liability action. Rather, the appellate court concluded, without analysis, that the PLCAA applied to plaintiffs' cause of action, so that plaintiffs were required to show that they fell within the exceptions to the Act in order to avoid the provisions of the Act. 378 Ill. App. 3d at 533.

In this court, plaintiffs deny that their lawsuit is a qualified civil liability action. Plaintiffs do not dispute that their lawsuit is a civil action or proceeding against a manufacturer of a qualified product and that the Beretta is a qualified product. However, plaintiffs deny that their civil action results from the criminal or unlawful misuse of a qualified product.

The PLCAA defines unlawful misuse as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. §7903(9) (2006). The PLCAA does not define "criminal" misuse. As Beretta notes, however, the word "criminal" in this portion of the statute is used as an adjective to modify the term "misuse." Black's Law Dictionary defines "criminal" in its adjective form as, "1. Having the character of a crime; in the nature of a crime <criminal mischief>. 2. Connected with the administration of penal justice <the criminal courts>." Black's Law Dictionary 402 (8th ed. 2004).

In this case, Billy was adjudicated delinquent based upon the finding of the court in the juvenile proceeding that Billy committed involuntary manslaughter and reckless discharge of a firearm when he shot Josh with his father's Beretta. This finding was affirmed on appeal. *In re W.S.*, No. 1—02—1170 (2003) (unpublished order under Supreme Court Rule 23). Billy's use of the Beretta, therefore, certainly violated the Criminal Code, a statute, when he was adjudicated delinquent for involuntary manslaughter and reckless discharge of a firearm, satisfying the definition of "unlawful misuse."

In addition, involuntary manslaughter (720 ILCS 5/9—3(a) (West 2000)) and reckless discharge of a firearm (720 ILCS 5/24—1.5(a) (West 2000)) are criminal offenses. It follows, then, that Billy's misuse of the Beretta in this case also had the character of a crime and was "in the nature of a crime" and, therefore, was a criminal misuse.

Plaintiffs, however, argue that this court may not look to Billy's juvenile adjudication in determining whether there was a criminal or unlawful misuse because that adjudication was described in an unpublished order pursuant to Illinois Supreme Court Rule 23 (210 Ill. 2d R. 23). Plaintiffs also argue that Billy's conduct could not be criminal or unlawful because Billy was adjudicated delinquent, and thus was not "convicted" of anything. Moreover, Billy had no criminal intent, so that his conduct could not be criminal. Finally, plaintiffs contend that Billy was not "using" the handgun, so there could be no unlawful "misuse" of the handgun, as required under the statute.

There is no merit to plaintiffs' claim that this court cannot look to Billy's juvenile adjudication as set forth in the appellate court's Rule 23 order. As Beretta notes, Illinois Supreme Court Rule 23 provides that unpublished orders of the appellate court may not be cited by any party for precedential value. 166 Ill. 2d R. 23(e). However, this court may take judicial notice of the Rule 23 order addressing Billy's appeal of his juvenile adjudication. See *In re Donald A.G.*, 221 Ill. 2d 234, 242 (2006) (this court took judicial notice of Rule 23 order in underlying criminal case); *People v. Ortiz*, 196 Ill. 2d 236, 265 (2001) (this court took judicial notice of Rule 23 order in codefendant's case).

Moreover, the definition of qualified civil liability action also does not contain a requirement that there be criminal intent or a criminal conviction. The statute only

requires "the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. §7903(5)(A) (2006). With regard to intent, the PLCAA does not limit criminal misuse to specific intent crimes.

Likewise, the PLCAA does not require a criminal conviction. As Beretta observes, Congress did require a conviction in order for another exception to the PLCAA to apply. See 15 U.S.C. §7903(5)(A)(i) (2006) ("an action brought against a transferor *convicted* under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so *convicted*" (emphases added)). When Congress includes particular language in one section of a statute but omits it in another section of the same act, courts presume that Congress has acted intentionally and purposely in the inclusion or exclusion. *Clay v. United States*, 537 U.S. 522, 528, 155 L. Ed. 2d 88, 95, 123 S. Ct. 1072, 1077 (2003). Therefore, because Congress specifically included language requiring a conviction in section 7903(5)(A)(i), but did not include such language in section 7903(5)(A), we presume that Congress did not intend criminal misuse to require proof of a criminal conviction.

Finally, there is no merit to plaintiffs' claim that Billy was not "using" the Beretta, so he could not have "misused" the weapon as set forth in the definition of a qualified civil liability action. Plaintiffs assert that the PLCAA implies the weapon is being used proactively for the purpose of firing or threatening to fire a projectile, and was not designed to apply, for example, where someone "using" a weapon by holding it drops the weapon, causing it to discharge. Plaintiffs claim that Billy was not using the Beretta as a weapon because he did not intend to fire it, so that Billy was not using the firearm as that word is used in the PLCAA.

We again note that the definition of a qualified civil liability action contains no intent requirement, so it does not matter whether Billy intended to fire the Beretta. The relevant inquiry is whether the misuse of the Beretta was criminal or unlawful. Moreover, this is not a case where Billy dropped the Beretta, causing it to accidentally discharge. Rather, Billy took his father's Beretta from his parents' bedroom closet, pointed the Beretta at Josh, and pulled the trigger. Billy therefore "used" the Beretta, and that "use" constituted a criminal or unlawful misuse of the Beretta for purposes of the PLCAA. Accordingly, we find that plaintiffs' lawsuit is a qualified civil liability action as defined in the PLCAA.

Because we find that plaintiffs' lawsuit was a qualified civil liability action, we next address whether the exceptions to the PLCAA apply in this case. The appellate court held that the only exception that applied in this case was the exception set forth in section 7903(5)(A)(v). 378 Ill. App. 3d at 533-34. Plaintiffs have not challenged this finding. We therefore limit our discussion to section 7903(5)(A)(v). Section 7903(5)(A)(v) provides that a qualified civil liability action shall not include:

> "an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage." 15 U.S.C. §7903(5)(A)(v) (2006).

With regard to this exception, the appellate court held that there was an issue of fact concerning whether Billy's act was volitional and whether Billy's actions were criminal or unlawful, so that it was for the trier of fact to determine whether the exception applied in this case.

378 Ill. App. 3d at 534. The appellate court explained that if Billy's actions were criminal, the PLCAA would foreclose plaintiffs' claims against Beretta. 378 Ill. App. 3d at 534. However, if Billy's actions were purely accidental and not unlawful or criminal, the exception under section 7903(5)(A)(v) would apply and plaintiffs' failure to warn claim against Beretta would not be precluded. 378 Ill. App. 3d at 534.

In questioning whether Billy's act was criminal or unlawful, the appellate court relied on the fact that Billy was adjudicated delinquent. The appellate court, citing this court's decision in *People v. Taylor*, 221 Ill. 2d 157 (2006), noted that a juvenile adjudication is not tantamount to a criminal conviction. In addition, Billy did not intend to shoot Josh. Accordingly, the appellate court concluded that there was a question of fact concerning whether Billy's act was volitional or criminal under the PLCAA.

We initially note that, like the definition of qualified civil liability action in section 7903(5)(A), the exception in section 7903(5)(A)(v) does not require a criminal conviction. The statute requires only that the volitional act constitute a criminal offense. As discussed, *supra*, Billy's act of shooting Josh constituted a criminal offense.

In any event, the appellate court has read our decision in *Taylor* too narrowly. Although this court in *Taylor* held that a juvenile adjudication was not tantamount to a criminal conviction, we also noted that the Juvenile Court Act was radically altered in 1999 "to provide more accountability for the *criminal acts* of juveniles." (Emphasis added.) *Taylor*, 221 Ill. 2d at 165. Moreover, the purpose and policy section of article V of the Juvenile Court Act declares that it is the intent of the General Assembly "to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency" and,

to effectuate that intent, declares among the important purposes of the Act "[t]o protect citizens from *juvenile crime*." (Emphasis added.) 705 ILCS 405/5—101(1)(a) (West 2000). Consequently, the fact that Billy was adjudicated delinquent does not mean that his actions were not criminal for purposes of section 7903(5)(A)(v).

We also find that Billy's act was a volitional act. Black's Law Dictionary defines volition as: "1. The ability to make a choice or determine something. 2. The act of making a choice or determining something. 3. The choice or determination that someone makes." Black's Law Dictionary 1605 (8th ed. 2004).

Likewise, Webster's defines volition as: "the act of willing or choosing : the act of deciding (as on a course of action or an end to be striven for) : the exercise of the will." Webster's Third New International Dictionary 2562 (1993). Webster's defines volitional as "of, relating to, or of the nature of volition: possessing or exercising volition." Webster's Third New International Dictionary 2562 (1993).

Plaintiffs and the appellate court read volitional to require a finding that Billy intended to shoot Josh or understood the ramifications of his conduct. We disagree. As Beretta argues, even if Billy did not intend to shoot Josh, Billy did choose and determine to point the Beretta at Josh and did choose and determine to pull the trigger. Although Billy did not intend the consequences of his act, his act nonetheless was a volitional act. Accordingly, pursuant to the PLCAA, the discharge of the Beretta in this case was caused by a volitional act that constituted a criminal offense, which the PLCAA provides "shall be considered the sole proximate cause of any resulting death, personal injuries or property damage." 15 U.S.C. §7903(5)(A)(v) (2006). The exception for qualified civil liability actions set forth in section 7903(5)(A)(v), therefore, does not apply, and plaintiffs' failure to warn claims are barred by the PLCAA.

Plaintiffs also argue that section 7903(5)(A)(v) does not apply because Billy's act was not the sole cause of Josh's injury. Plaintiffs, however, have misread the PLCAA. The PLCAA does not require a finding that the volitional act that constituted a criminal offense be the sole proximate cause of any resulting death. Rather, the PLCAA provides that "where the discharge of the product was caused by a volitional act that constituted a criminal offense, *then such act shall be considered the sole proximate cause of any resulting death \*\*\**." (Emphasis added.) 15 U.S.C. §7903(5)(A)(v) (2006).

Plaintiffs, however, argue that the PLCAA is unconstitutional because it violates the tenth amendment to the United States Constitution. The tenth amendment states:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X.

Plaintiffs claim that although Congress may generally enact laws requiring or prohibiting certain acts, it may not direct the action of state governments or state officials. Plaintiffs contend that by commanding state courts to immediately dismiss pending cases, the PLCAA leaves state courts with the function of simply confirming a judicial decision that Congress has already impermissibly made. Further, the PLCAA improperly infringes on state sovereignty by dictating to states how they must conduct their lawmaking function with respect to gun liability.

The appellate court in this case rejected plaintiffs' claim that the PLCAA violates the tenth amendment. The appellate court held that "plaintiffs have confused Congress's direct regulation and preemption of state law with commandeering state functions. Congress, Beretta correctly asserts, simply established a new federal standard that governs claims against the gun industry,

preempting conflicting state tort law, a common action." 378 Ill. App. 3d at 533. The appellate court noted that the United States District Courts for the Eastern District of New York and the Central District of California have found that the PLCAA is constitutional. The appellate court followed those decisions on the constitutional issues. 378 Ill. App. 3d at 533 (citing *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244 (E.D.N.Y. 2005), and *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274 (C.D. Cal. 2006)).

Although the district court in *Ileto* was not presented with a tenth amendment challenge to the PLCAA, the district court in *City of New York v. Beretta* did consider and reject such a challenge. The United States Court of Appeals for the Second District affirmed that decision. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008). The Court of Appeals noted that "the critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states." *City of New York*, 524 F.3d at 396. This is because federal statutes enacted under one of Congress' enumerated powers, such as the commerce clause, cannot violate the tenth amendment unless the statutes commandeer the states' executive officials or legislative processes. *City of New York*, 524 F.3d at 396. The Court of Appeals held that Congress validly enacted the PLCAA under the commerce clause. *City of New York*, 524 F.3d at 394-95. The Court of Appeals further held that the PLCAA does not commandeer any branch of state government because the PLCAA imposes no affirmative duty of any kind on any branch of state government. *City of New York*, 524 F.3d at 397. The PLCAA, therefore, does not violate the tenth amendment. *City of New York*, 524 F.3d at 397.

We agree with the decision of the Court of Appeals in *City of New York v. Beretta*. Accordingly, as Beretta argues, because the PLCAA is a valid exercise of the

federal power to regulate interstate commerce, Congress has not intruded upon an area of authority traditionally reserved to the states and does not impermissibly commandeer the states or their officials in violation of the tenth amendment. We therefore reject plaintiffs' constitutional challenge to the PLCAA and find that the PLCAA does not violate the tenth amendment.

As stated, we find that the PLCAA requires dismissal of plaintiffs' failure to warn claim against Beretta. We therefore reverse the appellate court's finding that there was an issue of fact concerning whether the PLCAA barred plaintiffs' failure to warn claim.

### Plaintiffs' Cross-Appeal

Finally, we note that plaintiffs have filed a cross-appeal challenging the appellate court's finding that the trial court properly dismissed plaintiffs' design defect claims because the Beretta was not unreasonably dangerous as a matter of law. Plaintiffs claim that the Beretta is unreasonably dangerous under both the consumer expectation test and the risk-utility test.

Upon review, we find that we need not consider whether the appellate court erred in finding that the Beretta was not unreasonably dangerous under the consumer expectation test and the risk-utility test. This court may affirm the appellate court on any basis in the record. *People v. Durr*, 215 Ill. 2d 283, 296 (2005). As noted, the exception to the PLCAA set forth in section 7903(5)(A)(v) applies to "an action for death, physical injuries or property damage resulting directly from *a defect in design or manufacture of the product*, when used as intended or in a reasonably foreseeable manner." (Emphasis added.) 15 U.S.C. §7903(5)(A)(v) (2006). We have held that the exception set forth in section 7903(5)(A)(v) does not apply in this case because the discharge of the Beretta was caused by a volitional act that constituted a criminal offense, which act shall be

considered the sole proximate cause of any resulting death. Accordingly, plaintiffs' design defect claims, as well as their failure to warn claims, are barred by the PLCAA. For that reason, we affirm the dismissal of those claims.

## CONCLUSION

For all the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part and the judgment of the circuit court is affirmed.

*Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.