No. 126,314

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARQUISE JOHNSON,
*Appellant*,

v.

BASS PRO OUTDOOR WORLD, LLC, FABBRICA D'ARMI PIETRO BERETTA, S.P.A., and
BERETTA U.S.A. CORP.,
*Appellees.*

SYLLABUS BY THE COURT

1.

Appellate courts review a trial court's ruling on a motion for summary judgment de novo, meaning we are unconstrained by the lower court's ruling because we are in the same position as the lower court. We must view the facts in the light most favorable to the party opposing summary judgment. If reasonable minds could disagree about the conclusions to be drawn from the evidence—if there is a genuine issue about a material fact—summary judgment is inappropriate.

2.

The Protection of Lawful Commerce in Arms Act precludes civil actions for damages against manufacturers and sellers of firearms "resulting from the criminal or unlawful misuse of" a firearm. That type of action is known as a "qualified civil liability action" in the Act. 15 U.S.C. § 7902(a); 15 U.S.C. § 7903(4), (5)(A).

3.

When a federal statute contains an express preemption provision like the one used in the Protection of Lawful Commerce in Arms Act, we look to the plain language of that provision to determine the scope of the preemption. That is the best evidence of congressional intent.

4.

An analysis of the scope of any express preemption provision in a federal statute must begin with the text. The interpretation of that language is guided by two principles about the nature of that preemption: (1) the presumption against preemption of the historic police powers of the states and (2) Congress' purpose in enacting the legislation.

5.

When a federal statute's text is ambiguous, courts can rely on the basic principles of federalism to resolve any ambiguity in a way that does not broadly intrude on the police power of the states.

6.

The Protection of Lawful Commerce in Arms Act provides that qualified civil liability actions "may not be brought in any Federal or State court." 15 U.S.C. § 7902(a). This provision expressly preempts state tort actions that are included in the definition of "qualified civil liability actions." The scope of the preemption is determined by the plain language of that definition and the exceptions listed in 15 U.S.C. § 7903(5).

7.

Generally, a culpable mental state of at least recklessness is an essential element of every crime. K.S.A. 21-5202(a). Where the statute defining the crime does not prescribe a culpable mental state, one is nevertheless required unless the definition of the crime "plainly dispenses with any mental element."

8.

"If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided." K.S.A. 21-5202(g).

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Oral argument held November 14, 2023. Opinion filed May 3, 2024. Reversed and remanded.

*David R. Morantz, Lynn R. Johnson,* and *Richard L. Budden*, of Shamberg, Johnson & Bergman, Chartered, of Kansas City, Missouri; *Erin Davis,* pro hac vice, of Brady United Against Gun Violence; and *Michael C. Helbert*, of Helbert & Allemang, of Emporia, for appellant.

*Daniel J. Buller*, of Foulston Siefkin LLP, of Overland Park, *David E. Rogers*, of the same firm, of Wichita, and *Craig A. Livingston*, pro hac vice, of Livingston Law Firm, P.C., of Walnut Creek, California, for appellees.

Before HILL, P.J., CLINE and ISHERWOOD, JJ.

HILL, J.: Summary judgment motions are one way for parties in civil disputes to avoid an expensive and unnecessary trial. But such motions are not a substitute for a trial. If the undisputed facts and the controlling law compel summary judgment, then the motion should be granted. If a judge, however, feels compelled to grant a summary judgment motion on facts the judge finds to be true, then the motion should be denied because a summary judgment motion is not a fact-finding procedure. Hearing such motions is not a time to weigh evidence. That function is left for the jury to perform.

This is an interlocutory appeal by Marquise Johnson of an order granting summary judgment. The order dismissed his product defect lawsuit against a gun seller, the

distributer, and the manufacturer of the pistol used in shooting him. In doing so, the court relied on provisions of the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903. Johnson contends that the court was in error by replacing the jury and finding facts. We agree and reverse.

We begin with the facts. Then, to resolve this dispute, we must delve into the concept of federalism. That legal doctrine controls how state and federal laws mesh so there are clear lines of authority and control. We then consider the Act itself, analyzing two key subdivisions of the law. Finally, we examine the arguments of the parties and explain why we think the district court prematurely granted summary judgment.

*Firearms are dangerous to life and limb.*

Shortly after turning 21, Andre Lewis went to the Bass Pro Outdoor World in Olathe, Kansas, and bought a Beretta APX 9mm pistol. This was his first gun purchase, but Lewis was no stranger to guns. From an early age, Lewis had handled shotguns and rifles. He had also fired Glock and Hi-Point pistols as well as various revolvers. In middle school, Lewis attended a Hunter's Safety Course. He received his first hunting rifle when he was 18. Lewis bought the APX pistol for self-protection and stored the gun under the driver's seat of his car. Several warnings about the safe operation of his specific pistol came with his purchase.

*Lewis ignored several warnings.*

Lewis received the Beretta APX Pistol User Manual during his purchase of the firearm. The manual cautioned users that a live cartridge of ammunition could remain in the firing chamber even if the magazine is removed. In particular, the manual provided: "WARNING: Always visually inspect the firing chamber to ensure that it is empty. The chamber is empty when no cartridge is visible when looking from the ejection port into

4

the open chamber." Lewis did not, however, read the user manual and did not know the difference between the APX pistol and other guns that he had previously handled.

Lewis also received Bass Pro Shop's "10 Commandments of Safe Gun Handling" during his purchase of the firearm. He only spent a few minutes reviewing the safety sheet before certifying that he read and understood its contents.

Besides the user manual and commandments, two warnings were stamped directly on the gun: "READ MANUAL BEFORE USE" and "FIRES WITHOUT MAGAZINE."

The APX pistol also has a unique feature known as the "striker deactivation button," which Lewis could have pressed to safely release the striker before disassembly.

If all other warnings remained unheeded, at the very least Lewis' experience and training with firearms should have prevented this incident. Lewis knew the danger of pointing a gun at another person. Lewis knew to treat every firearm as if it were loaded. Lewis knew how to pull the slide of the pistol back to visually inspect the firing chamber to check for a live round.

*Inattention and inadvertence lead to a lost limb.*

While driving his football teammates home from a team dinner, Andre Lewis pulled the pistol out from under his seat. His teammate, Marquise Johnson, who sat in the front passenger seat, asked to see the gun. While stopped at a stoplight, Lewis removed the magazine and handed the gun to Johnson. Johnson briefly looked at the gun and, as he passed it back to Lewis, asked Lewis if he knew how to clean the gun. Lewis boasted that he knew how to disassemble the gun in "2.2 seconds." Lewis disassembled the gun to prove his claim.

Lewis believed the gun was unloaded. That was a mistake. He did not know the gun could fire after the magazine was removed. He also assumed the pistol worked just like the Glock pistols he had handled before. Believing the pistol worked just like the Glock pistol, Lewis thought he needed to pull the trigger to remove the slide.

Lewis pointed the barrel of the pistol at Johnson and pulled the trigger. The bullet that remained in the chamber of the gun discharged and struck Johnson's legs. Lewis immediately drove to the hospital while he and his teammates applied pressure to the wound. Lewis' inattention and inadvertence resulted in the amputation of Johnson's left leg above the knee.

*After an investigation, no criminal charges were filed against Lewis.*

Following the incident, the Emporia Police Department ruled that the shooting was an accident. The Lyon County Attorney's Office investigated the incident and was unable to "find sufficient facts to support a conclusion of reckless behavior as defined by our statute." Further determining that the behavior "does not appear to meet the legal definition of disregarding a substantial and unjustifiable risk or result." The prosecutors also determined Lewis had not violated the criminal discharge of a firearm on a public road statute because his actions were not those which "the legislature contemplated in enacting the statute." Lewis was never charged with the criminal discharge of a firearm.

*Johnson seeks damages.*

Johnson sued Lewis, the shooter; Fabbrica d'Armi Pietro Beretta S.p.A., the designer and manufacturer of the gun; Beretta U.S.A. Corp., the importer and distributer of the gun; and Bass Pro Outdoor World, LLC, the retailer of the gun. Johnson's theory of the case was that the gun was unreasonably dangerous because it lacked reasonable safety features commonly available such as magazine disconnect safety to prevent the gun from

6

firing after the magazine has been removed and a loaded chamber indicator to alert the user that a round of ammunition is in the chamber.

Beretta U.S.A. and Bass Pro moved for summary judgment under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, which precludes a civil action for damages against manufacturers and sellers of firearms "resulting from the criminal or unlawful misuse of" a firearm. 15 U.S.C. § 7903(5)(A). The district court granted the motion. This court granted Johnson's application for interlocutory review.

*The district court granted summary judgment to some defendants.*

The district court concluded Lewis was reckless as a matter of a law. The court stated that there was only an objective standard and Lewis' subjective beliefs were not relevant. The court reasoned that firearms carry "certain unavoidable risks." Lewis did not read the operator's manual or heed the warning printed on the gun. He had experience and training. If Lewis had followed the safe gun handling commandments, the injury would not have occurred. He pointed the gun directly at Johnson. He intentionally pulled the trigger without any certainty whether there was a cartridge in the chamber. He failed to use the button on the gun permitting dismantling without pulling the trigger. He chose to dismantle the gun merely to prove that he could while operating a motor vehicle.

The court ruled whether Lewis pulled back the slide of the gun to find out if there was a cartridge in the chamber was controverted but was not a material fact:

> "It is true that there are contradictory statements regarding whether he visually checked for a live cartridge, but the difference is, again, immaterial in my view. I find that this factual dispute does not rise to the level of a material issue. Whether he checked or not, the fact is undisputed that there was a live cartridge in the chamber of the firearm which discharged when Lewis pulled the trigger."

7

The court found as fact that Lewis intentionally removed the magazine to disarm the gun, that he did not know the gun could fire with the magazine removed, and that he believed the gun was unloaded. But these circumstances were not sufficient to raise a genuine issue of material fact to preclude summary judgment.

*We are not constrained by the district court's ruling.*

Appellate courts review a trial court's ruling on a motion for summary judgment de novo, meaning we are unconstrained by the lower court's ruling because we are in the same position as the lower court. We must view the facts in the light most favorable to the party opposing summary judgment. If reasonable minds could disagree about the conclusions to be drawn from the evidence—if there is a genuine issue about a material fact—summary judgment is inappropriate. *H.B. v. M.J.*, 315 Kan. 310, 313, 508 P.3d 368 (2022).

Finally, a disputed question of fact which is immaterial to the issue does not preclude summary judgment. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 934, 296 P.3d 1106, *cert. denied* 571 U.S. 826 (2013).

*We offer observations about the federal law.*

The Protection of Lawful Commerce in Arms Act precludes civil actions for damages against manufacturers and sellers of firearms "resulting from the criminal or unlawful misuse of" a firearm. That type of action is known as a "qualified civil liability action" in the Act. 15 U.S.C. § 7902(a); 15 U.S.C. § 7903(4), (5)(A).

There is, however, a product defect exception for actions for physical injury "resulting directly from a defect in design or manufacture" of a firearm. But this

exception does not apply when "the discharge of the [firearm] was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v). *The parties adopt opposite positions before us.*

Arguing that his lawsuit should be revived, Johnson contends the accidental discharge of a firearm is not a volitional, criminal act or unlawful misuse of a firearm as a matter of law. Thus, in his view, the defendants are not shielded by the Act. He also argues that the district court did not resolve the material facts and all inferences that could be drawn from the evidence in Johnson's favor as required on a motion for summary judgment.

Highly summarized, Lewis argues that:

(1) Federalism commands courts to narrowly construe the Act.

(2) Only claims solely caused by criminal acts are prohibited.

(3) All the potentially relevant criminal statutes require at least a mens rea of recklessness. Lewis did not consciously disregard a risk.

(4) The discharge of the gun was not a volitional act because Lewis did not intend the gun to discharge when he pulled the trigger.

The defendants contend Congress intended the Act to cover lawsuits like this one where the firearm functioned as designed. The gun here was designed to fire a chambered cartridge when the trigger is pulled. Any reasonable person would have appreciated the risk of a discharge upon pulling the trigger. Lewis ignored safe gun handling rules, the user's manual, and warnings stamped on the gun. Lewis admitted he did not pull the slide back to check the chamber for a live cartridge. Lewis' recklessness was overwhelming. Both the act of pointing the gun in Johnson's direction and the act of pulling the trigger were volitional. And, finally, the Act expressly preempts state tort law. We begin with preemption.

9

*The scope of preemption is determined by the text of the law.*

Johnson contends federalism commands courts to narrowly construe the Act.

Article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land." Art. VI, cl. 2. State law that conflicts with federal law is without effect. But there is a presumption that the historic powers of the states are not to be superseded by federal law unless it is "'the clear and manifest purpose of Congress.'" Accordingly, Congress' intent is paramount. Congress' intent may be "'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" In the absence of an express congressional command, state law is preempted if that law conflicts with federal law or if federal law thoroughly occupies a legislative field. *Cipollone v. Liggett Grp., Inc*., 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992).

When Congress has included a provision explicitly addressing preemption that provides a reliable indicator of congressional intent, there is no need to infer congressional intent to preempt state law from the substantive provisions of the legislation. "Such reasoning is a variant of the familiar principle of *expression unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517; see *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 138, 202 A.3d 262 (2019) (finding no indication in the text of the Act that Congress intended to restrict the power of the states to regulate wrongful advertising). Translating the Latin and the canon of construction simply means to express or include one thing implies the exclusion of the other.

In other words, when a statute contains an express preemption provision like the one used here, we look to the plain language of that provision to determine the scope of

10

the preemption. That is the best evidence of Congress' intent. See *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp*., 537 U.S. 51, 62-63, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002).

Even though our analysis of the scope of an express preemption provision must begin with the text, the interpretation of that language is guided by two principles about the nature of preemption: (1) the presumption against preemption of the historic police powers of the states and (2) Congress' purpose in enacting the legislation. See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-86, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996).

When the provision's text is ambiguous, courts can rely on the basic principles of federalism to resolve the ambiguity in a way that does not broadly intrude on the police power of the states. See *Bond v. United States*, 572 U.S. 844, 859-60, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014).

The Act provides that qualified civil liability actions "may not be brought in any Federal or State court." 15 U.S.C. § 7902(a). This provision expressly preempts state tort actions that are included in the definition of "qualified civil liability actions." The scope of the preemption is determined by the plain language of that definition and the exceptions listed in 15 U.S.C. § 7903(5). See *Delana v. CED Sales, Inc*., 486 S.W.3d 316, 324 (Mo. 2016); *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 387-88 (Alaska 2013).

*"Resulting from" does not mean "solely caused by."*

Under the Act, manufacturers and sellers of firearms are not subject to civil actions for damages "*resulting from* the criminal or unlawful misuse of" a firearm. That type of action is a "qualified civil liability action." (Emphasis added.) 15 U.S.C.

11

§ 7902(a); 15 U.S.C. § 7903(4), (5)(A). Johnson contends "resulting from" means "solely caused by" criminal or unlawful misuse, to give effect to Congress' stated intent for enacting the Act in 15 U.S.C. § 7901.

Black's Law Dictionary defines the verb "result" as: "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion <much good will result from this>." Black's Law Dictionary 1573 (11th ed. 2019).

Congress stated one of its purposes for the Act was:

> "To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm *solely caused by* the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." (Emphasis added.) 15 U.S.C. § 7901(b)(1).

We consider that language to be significant. "'A preamble, purpose clause, or recital is a permissible indicator of meaning.'" *Bittner v. United States*, 598 U.S. 85, 99 n.6, 143 S. Ct. 713, 215 L. Ed. 2d 1 (2023). But "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner*, 598 U.S. at 94. Congress may enact a more general statute than necessary to accomplish its purpose. See *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (Congress' purpose in enacting RICO was the perceived need to combat organized crime. But Congress chose to enact a more general statute which was not limited to organized crime.).

We note that several other courts when considering similar arguments have declined to elevate the Act's preamble over the substantive language in 15 U.S.C.

§ 7903(5)(A). See *Travieso v. Glock Inc*., 526 F. Supp. 3d 533, 543 (D. Ariz. 2021); *Delana*, 486 S.W.3d at 321-22; *Coxe*, 295 P.3d at 386-87. To interpret "resulting from" as "solely caused by" would render redundant many—if not all—of the exceptions listed in the statute. Congress chose to exclude only certain types of tort actions from the broader definition of qualified civil liability action. This reasoning is impeccable. Thus, we conclude that "resulting from" does not mean "solely caused by."

*K.S.A. 2022 Supp. 21-6308(a)(3)(B) does not require a culpable mental state, so this is a qualified civil liability action prohibited by the Act.*

In considering whether Lewis' conduct violated a criminal statute, the district court first concluded that there was "no question" Lewis violated K.S.A. 2022 Supp. 21-6308(a)(3)(B) (criminal discharge of a firearm upon a public road) because that statute did not require any specific mental state as an element of the crime. We question that holding because we think a deeper analysis is called for. When considering the crime of criminal discharge of a firearm upon a public road, the "notes on use" in the appropriate PIK instructions say that "the court must determine whether a culpable mental state is required." PIK Crim. 4th 63.070.

Generally, a culpable mental state of at least recklessness is an essential element of every crime. K.S.A. 21-5202(a). Where the statute defining the crime does not prescribe a culpable mental state, one is nevertheless required unless the definition of the crime "plainly dispenses with any mental element." K.S.A. 21-5202(d).

But when the statute defining the crime contains alternative ways of committing the crime, some ways contain mental culpability language and other ways do not, then courts must follow the directions in K.S.A. 21-5202(g) and pick and choose:

"If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided." K.S.A. 21-5202(g).

For example, in *State v. Dinkel,* 314 Kan. 146, 158, 495 P.3d 402 (2021), the court applied K.S.A. 2020 Supp. 21-5202(g) to the rape statute and concluded that because the statute included a mental state in some of the various means of committing rape but did not include a mental state for rape of a child, there was no mental culpability requirement for rape of a child. The construction of the rape statute sets out the elements:

"'(a) Rape is:
  (1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:
    (A) When the victim is overcome by force or fear; or
    (B) when the victim is unconscious or physically powerless;
  (2) Knowingly engaging in sexual intercourse with a victim when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender;
  (3) sexual intercourse with a child who is under 14 years of age;
  (4) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a medically or therapeutically necessary procedure; or
  (5) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a legally required procedure within the scope of the offender's authority.' K.S.A. 2020 Supp. 21-5503." *Dinkel*, 314 Kan. at 156.

Note subsection (3) has no mental culpability requirement.

In a similar way, the criminal discharge of a firearm statute lists several ways of committing the named crime. Only subsection (a)(3)(B) omits a mental culpability element. The criminal discharge of a firearm statute reads:

"(a) Criminal discharge of a firearm is the:

(1) *Reckless* and unauthorized discharge of any firearm:

(A) At a dwelling, building or structure in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present;

(B) at a motor vehicle, aircraft, watercraft, train, locomotive, railroad car, caboose, rail-mounted work equipment or rolling stock or other means of conveyance of persons or property in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present;

(2) *reckless* and unauthorized discharge of any firearm at a dwelling in which there is no human being; or

(3) discharge of any firearm:

(A) Upon any land or nonnavigable body of water of another, without having obtained permission of the owner or person in possession of such land; or

(B) *upon or from any public road, public road right-of-way or railroad right-of-way except as otherwise authorized by law.*" (Emphasis added.) K.S.A. 2022 Supp. 21-6308.

Clearly, the criminal discharge of a firearm statute imposes a mental culpability requirement on some ways of committing criminal discharge of a firearm but not on criminal discharge of a firearm upon a public road. Therefore, under K.S.A. 21-5202(g), there is no mental culpability requirement for criminal discharge of a firearm upon a public road. It is also evident from reading the statute as a whole that the Legislature intended to criminalize any discharge of a firearm upon a public road, unless it met one of the enumerated exceptions or was otherwise authorized by law.

Aside from the omission of the term "reckless," the Legislature treated subsection (a)(3) differently than the other subsections in other ways. Subsection (a)(3) does not apply to several categories of persons such as law enforcement officers, members of the armed services, private detectives, the state fire marshal, and the Attorney General while engaged in duties of employment. See K.S.A. 2022 Supp. 21-6308(d). And violation of subsection (a)(3) is a class C misdemeanor, while violation of one of the other subsections constitutes a felony. K.S.A. 2022 Supp. 21-6308(b).

To sum up, we hold that because Lewis discharged a firearm upon or from a public road, he violated the plain language of the criminal statute. The prosecutor's discretionary decision not to charge him with the crime does not alter what happened. Johnson's claim results from the criminal and unlawful misuse of a firearm and is therefore a qualified civil liability action as contemplated by the Act. There are no material disputed facts related to this issue.

*Was the discharge of the gun caused by a volitional act as a matter of law?*

The district court ruled the term "volitional act" in the product defect exception added an element of intent. The court cited *Thomas v. Benchmark Ins.*, 285 Kan. 918, 179 P.3d 421 (2008). The court concluded that Lewis' action of pointing the gun at Johnson and pulling the trigger was an intentional act that included an inherent risk of injury. The court then inferred that Lewis intended to cause injury due to the nature of Lewis' reckless and improper handling of the firearm. Therefore, the product defect exception did not apply.

*We move to the question of whether this was a volitional act.*

As stated above, a suit is not excluded under the Act if the action results "directly from a defect in design or manufacture of the product, when used as intended or in a

16

reasonably foreseeable manner, except that where *the discharge of the product was caused by a volitional act that constituted a criminal offense*, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage." (Emphasis added.) 15 U.S.C. § 7903(5)(A)(v).

Having already determined the discharge of the gun on a public road constituted a criminal offense, the issue is whether "the discharge" of the gun "was caused by a volitional act."

Both parties agree the district court incorrectly relied on *Thomas*. We agree. This is a question of statutory interpretation of the Act. Johnson contends the discharge of the gun was not a volitional act because, viewing the facts and inferences in the light most favorable to him, Lewis did not intend the gun to discharge when he pulled the trigger nor did he intend to cause injury. Defendants contend the term "volitional" modifies "act."

There is no question here that Lewis chose to pull the trigger. But there is also no question Lewis did not choose or intend for the gun to discharge when he pulled that trigger. A volitional act is one that a person willfully takes regardless of the consequences. Both the act of pointing the gun in Johnson's direction and the act of pulling the trigger were volitional acts. If, for example, Lewis had accidentally dropped the gun and it discharged, that would not be a volitional act.

Several courts have addressed the interpretation of the so-called "exception to the exception." Some judges have taken the expansive view that any volitional act in the causal chain that constitutes a criminal offense suffices to bar the plaintiff's claim. In *Ryan v. Hughes-Ortiz*, 81 Mass. App. Ct. 90, 93, 959 N.E.2d 1000 (2012), Milot accidentally shot himself while trying to put a gun back in its container. Milot's possession of the firearm was a criminal offense in violation of 18 U.S.C. § 922(g)(1)

17

because he had been convicted of a felony. In upholding a grant of summary judgment, the appeals court held, "[T]he relevant volitional act that caused the gun's discharge was Milot's unlawful possession of the Glock pistol. Milot's volitional act constituted a criminal offense and the design defect exception is therefore not applicable." *Ryan*, 81 Mass. App. Ct. at 100.

*Other courts have reviewed the exception to the exception in order to give effect to the statute.*

In *Gustafson v. Springfield, Inc.,* 282 A.3d 739, 740 (Pa. Super. 2022), *rev. granted* April 18, 2023, a deeply divided opinion, a 14-year-old boy obtained a semiautomatic handgun. The boy removed the handgun's magazine and believed the gun was unloaded. The boy pulled the trigger and the gun discharged. The boy's friend was shot and killed. Interpreting the product defect exception, one opinion commented that the exception to the product defect exception rendered the product defect exception "toothless, because *all* criminal offenses require a *volitional* act." 282 A.3d at 743. The opinion concluded the product defect exception will never apply. 282 A.3d at 744.

The plain language of the product defect exception can support the expansive view. The term "volitional" modifies the term "act." Interpreting the phrase "was caused by a volitional act that constituted a criminal offense" to mean *any* cause in the causal chain, gives effect to the last phrase in the exception stating that "then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage." (Emphasis added.) 15 U.S.C. § 7903(5)(A)(v). This interpretation, however, would swallow the product defect exception entirely.

Some judges have ruled more narrowly that pointing a gun in the direction of a person and pulling the trigger are volitional acts sufficient to bar a product defect suit even though the discharge of the gun was not intended. In *Travieso v. Glock Inc.*, 526 F.

18

Supp. 3d 533, 536 (D. Ariz. 2021), while travelling home from a youth camping trip in a church leader's vehicle, a 14-year-old girl who was in the vehicle came into possession of a handgun. The handgun discharged and Travieso was hit in the back. The court granted the defendant's motion to dismiss, concluding that the girl took multiple volitional actions that constituted criminal offenses including taking possession of the gun and pulling the trigger while the gun was pointed at another person. 526 F. Supp. 3d at 548.

In *Adames v. Sheahan*, 233 Ill. 2d 276, 280-82, 909 N.E.2d 742 (2009), a 13-year-old boy, Billy, was playing with his father's service weapon. Billy took the magazine out of the gun, pretended he was firing the gun, and pulled the trigger. The gun discharged. His friend, Josh, was hit in the stomach. In affirming summary judgment, the appeals court held, "[E]ven if Billy did not intend to shoot Josh, Billy did choose and determine to point the Beretta at Josh and did choose and determine to pull the trigger. Although Billy did not intend the consequences of his act, his act nonetheless was a volitional act." 233 Ill. 2d at 314.

*Some courts have ruled that lawsuit was not barred.*

In contrast, other judges have determined the "exception to the exception" is more limited. One of the *Gustafson* opinions stated the *discharge* of the gun had to be volitional:

> "In typical circumstances, the intentional act of pulling a trigger is effectively identical to intentionally firing the gun, regardless of whether the resulting injury was intended. However, the factual averments of the Gustafsons suggest otherwise, as they contend that while the Juvenile Delinquent's pulling of the trigger was volitional, the firing of the gun was not, because he believed that the firearm was not loaded when the magazine was disengaged. I do not think the relevant criminal act of discharging the gun was volitional, even if it was criminal in nature. This is the essence of the product defect claims at issue: whether the gun could have been made safer such that a person in the Juvenile

19

Delinquent's position would have been deterred from pulling the trigger when he, in fact, did not intend for the gun to discharge. . . .

. . . .

". . . Here, based upon the factual averments contained in their complaint, there is an atypical disconnect in the chain of causation between pulling the trigger and discharging the weapon that is not present in archetypal criminal use or misuse of a firearm cases that Congress sought to address in the caveat to the product-defect exception. In my view, this distinction is factual, not legal." *Gustafson*, 282 A.3d at 760-61.

In the more refined view, it was the discharge of the firearm that is the focus of the analysis.

In *Heikkila v. Kahr Firearms Group*, No. 1:20-CV-02705-MDB, 2022 WL 17960555, at *1 (D. Colo. 2022) (unpublished opinion), the plaintiff had a gun holstered to his belt as he went to use a movie theatre bathroom. While pulling up his pants, the gun discharged and struck him in the abdomen. The court found that whether the discharge was caused by a volitional act that constituted a criminal offense turned on facts that were still in dispute. While application of the Act only required that the claim result from criminal or unlawful misuse, the product defect exception hinged on whether the volitional criminal offense caused the actual discharge of the product. 2022 WL 17960555, at *12.

In *Chavez v. Glock, Inc.,* 207 Cal. App. 4th 1283, 1290, 144 Cal. Rptr. 3d 326 (2012), a police officer was shot in the back with his service weapon by his three-year-old son. The appellate court reversed a grant of summary judgment under the product defect exception to the Act. The defendants had argued the discharge of the gun was caused by plaintiff's volitional criminal acts of leaving the loaded pistol unsecured in his truck and placing his son in the backseat of his truck without being secured in a car seat. The appellate court concluded the causal connection was lacking:

"By specifically linking the actual act of discharge to the criminal offense, as it did, we do not believe Congress intended, as Glock and Revolver Club argue, to allow any unlawful act in the causal chain, however remote from the actual firing of the weapon, to defeat the exclusion. Indeed, to construe the exclusion as expansively as do Glock and Revolver Club, would effectively eliminate the exception for product design defect claims expressly provided by Congress." 207 Cal. App. 4th at 1317-18.

It appears to us that the *Gustafson*, *Travieso*, and *Adames* cases are most like this case because they were accidental shootings that involved a person pulling the trigger of a gun. The act of pulling the trigger is not a remote act from the actual firing of the weapon in the causal chain like the criminal act was in *Chavez*. But this case presents a factual circumstance not found in the other cases. Lewis pulled the trigger to disassemble the gun, which apparently is required to disassemble the type of gun Lewis was more familiar with. Thus, the essence of Johnson's product defect claim is whether the gun should have been made safer to prevent this type of mistake. We therefore focus on the discharge of the pistol.

The divergent opinions on this matter signal that the statute is ambiguous. The "exception to the exception" is not written in a straight-forward manner. If it is ambiguous, it must be reconciled with Congress' intent. The language cannot be interpreted so broadly that it would swallow the product defect exception entirely, as some judges have suggested.

As stated above, "'[a] preamble, purpose clause, or recital is a permissible indicator of meaning.'" *Bittner*, 598 U.S. at 99 n.6. "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner*, 598 U.S. at 94. When the provision's text is ambiguous, courts can rely on the basic principles of federalism to resolve the ambiguity in a way that does not broadly intrude on the police power of the States. See *Bond*, 572 U.S. at 859-60.

21

Congress used different language in the product defect exception than it did in the general definition of "qualified civil liability action." Therefore, the two phrases must mean something different. A qualified civil liability action is a claim "resulting from the criminal or unlawful misuse of" a firearm. 15 U.S.C. § 7902(a); 15 U.S.C. § 7903(4), (5)(A). In contrast, the product defect exception does not apply when "the discharge of the [firearm] was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v).

Congress stated it was concerned about stopping civil actions that had been commenced against the gun industry that were "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. § 7901(a)(7). As defendants' counsel explained, before the enactment of the Act, suits were instituted against the firearms industry to attempt to make the industry bear the expense of gun violence. Congress also found that the manufacture and sale of firearms in the United States were already heavily regulated. 15 U.S.C. § 7901(a)(4). But Congress chose to exempt product defect suits from the Act. Product defect claims are well established under common law.

The product defect exception to the Act allows claims against gun companies for accidental shootings resulting directly from design defects. The "exception to the exception" excludes those claims where the discharge of the gun was intentional. This makes sense because design mechanisms devised to prevent accidental shootings would not prevent intentional shootings. The middle ground between the two ends is unsettled. The presumption against preemption can be used to resolve this question in favor of Johnson's interpretation. Lewis did not intend for the gun to discharge when he pulled the trigger. The shooting was not a volitional act, it was accidental.

*Lewis' conduct was not reckless as a matter of law; that is a disputed material fact.*

The next issue we must address is whether it was appropriate at the summary judgment stage for the trial court to determine Lewis' recklessness as a matter of law. A jury could find Lewis was reckless, but that was not the only reasonable conclusion that could be drawn from the evidence. At the summary judgment stage, the court needed to view the evidence in the light most favorable to Johnson. We question whether the district court did that.

In Kansas, "[a] person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j).

A person can disregard a substantial and unjustifiable *risk* that the circumstances exist without knowing that the circumstances exist. See *State v. Pattillo*, 311 Kan. 995, 1003-04, 469 P.3d 1250 (2020). When discussing reckless criminal discharge of a firearm under K.S.A. 2017 Supp. 21-6308(a)(1)(B), a panel of this court noted that "[t]he focus in this statute is not to punish someone for intending harm to a person, but to punish someone for the risky action of recklessly firing a gun. Harm to a person need not be intended, in fact the offender need not know a person is there." *State v. Reynolds*, No. 124,238, 2023 WL 6323141, at *13 (Kan. App. 2023) (unpublished opinion).

A person may *recklessly* cause great bodily harm or disfigurement to another person even when the person intentionally performed the act that caused the injury. *State v. Trefethen*, No. 119,981, 2021 WL 1433246, at *6 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan. 859 (2021). The fact that the shooting was accidental is not dispositive. "A person may be *involved in an accident* that results from reckless conduct." *State v. Doll*, No. 124,147, 2022 WL 17729716, at *5 (Kan. App. 2022)

23

(unpublished opinion), *rev. denied* 317 Kan. 847 (2023). Or there can be an accidental and innocent shooting with no reckless conduct. See *State v. McKinney*, 59 Kan. App. 2d 345, 351, 481 P.3d 806 (2021), *rev. denied* 313 Kan. 1046 (2021).

The determination of recklessness is a fact-based inquiry. "One piece of evidence 'cannot be plucked out of the record and examined in a vacuum'" to determine whether an inference of recklessness is appropriate under circumstances. *State v. Henson*, 287 Kan. 574, 588, 197 P.3d 456 (2008). Facts that can support or dispute a finding of recklessness in a case involving an accidental shooting include whether the shooter: (1) removed the magazine; (2) pulled the slide back to eject a chambered bullet; (3) checked that a live round was not left in the chamber; (4) pointed the gun in the direction of a person; (5) pulled the trigger; (6) was familiar with guns and gun safety; and (6) was intoxicated. See *State v. Weigel*, No. 113,540, 2016 WL 4161326, at *9 (Kan. App. 2016) (unpublished opinion); *State v. Harner*, No. 110605, 2015 WL 4879012, at *9-10 (Kan. App. 2015) (unpublished opinion).

Here, the district court was too quick to grant summary judgment on the recklessness issue. The question of whether Lewis pulled back the slide to eject the chambered round was a material disputed fact. That Lewis intentionally removed the magazine to disarm the gun and that he did not know the gun could fire with the magazine removed were material facts that supported Johnson's position that Lewis was not reckless. The district court did not view the evidence and all inferences that could be drawn from the evidence in the light most favorable to Johnson.

*We will not rule on the lower court's evidentiary ruling.*

Johnson contends the district court improperly struck certain testimony as inadmissible. The testimony would be admissible at trial as lay opinion causation testimony.

24

This focuses on the district court's striking of certain testimony. In his response to the defendants' summary judgment motion, Johnson alleged these facts:

"16. If anyone from Bass Pro had discussed with defendant Lewis the safety options of a loaded chamber indicator or magazine disconnect safety on the Beretta APX pistol or any other pistol, defendant Lewis would have considered purchasing a gun with those safety features.

"17. If the Beretta APX had a loaded chamber indicator on it, it would have indicated that there was a round in the chamber even when the magazine was out.

"18. If defendant Lewis had seen a loaded chamber indicator signaling the Beretta APX pistol was still loaded after removing the magazine, he would not have pulled the trigger to try to take the pistol apart, preventing Plaintiff's injuries.

"19. If the Beretta APX pistol had a magazine disconnect safety on it, it would have been unable to fire without the magazine in it."

The district court made an ad hoc comment about the admissibility of this testimony, ruling:

"Plaintiff's Fact Nos. 16 [through] 19 are also accurate recitations from the record, and they relate to Lewis' subjective beliefs as to the actions he might have taken. They would be inadmissible as conjecture, but more importantly do not raise issues of material fact. The Court would concede that they may explain why Lewis decided to pull the trigger, but do not controvert the fact that he intentionally did so."

This evidentiary issue is not properly before us. Johnson sought and was granted interlocutory appeal under K.S.A. 2023 Supp. 60-2102(c) because the applicability of the Act was a controlling question of law.

Generally, our task in an interlocutory appeal is to answer certified questions rather than to rule on the propriety of all rulings of the district court. But we will exercise pendent or supplemental interlocutory jurisdiction if a certified issue is "inextricably

25

intertwined" with other issues that do not meet K.S.A. 2023 Supp. 60-2102's criteria for an interlocutory appeal. The exception aims to allow meaningful review of the certified issue and promote judicial economy. *City of Neodesha v. BP Corp. N. Am.,* 295 Kan. 298, 312, 287 P.3d 214 (2012).

Johnson offers us no explanation why this evidentiary question is "inextricably intertwined" with the question of the applicability of the Act. He merely makes that assertion.

The statements concern the causation for his product defect allegations and do not raise issues of material fact on the question of the applicability of the Act. This evidentiary issue is not inextricably intertwined with the question certified for interlocutory appeal. We will not consider the issue.

CONCLUSION

Tragedy struck one night in a car in Emporia, Kansas. Youthful bravado combined with ignorance of his pistol led a young man to shoot his friend with tragic consequences. As a result, his friend lost part of his leg. Seeking justice, that young man sued, claiming a perceived product defect. The district court granted summary judgment after making some factual determinations it was not yet legally entitled to make. Factual inferences are to be made in favor of the party against whom summary judgment is sought. The district court here failed to do so. Simply put, the district court was premature in granting the summary judgment. We reverse and remand for further proceedings.

Reversed and remanded.

26

\* \* \*

CLINE, J., dissenting:  Although I agree with the majority's conclusion that Marquise Johnson's claim is a qualified civil liability action under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, I respectfully dissent from its conclusion that his claim is protected by the Act's product defect exception. I also disagree with its conclusion that the district court erred in determining Lewis was reckless as a matter of law. I believe the material uncontroverted facts show Lewis acted recklessly, and his discharge of the firearm was a volitional act. For these reasons, I do not believe the product defect exception applies. Johnson's claim is barred by the Act, and I would affirm the district court's decision granting summary judgment on this basis.

*Lewis' behavior was legally reckless.*

Summary judgment is proper when there are no material controverted facts, and the movant is entitled to judgment as a matter of law. K.S.A. 2023 Supp. 60-256(c). To avoid summary judgment on this issue, Johnson had the burden to affirmatively show the evidence established a material question of fact about whether Lewis' actions were reckless. I disagree with the majority's conclusion that he met this burden. Even viewing the evidence in the light most favorable to Johnson—as we are required to do—I would find he failed to establish a material factual dispute that must be resolved by a jury. *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 56, 847 P.2d 1321 (1993). And based on the uncontroverted material facts, I believe the district court correctly concluded as a matter of law that Lewis acted recklessly.

The district court thoroughly analyzed the uncontroverted and controverted facts, sorting out which were material when making its determination. Since I find the district court's analysis articulate and persuasive, I quote it in full here:

27

"When dealing with firearms, there are certain unavoidable risks. That is why we have a multitude of warnings, even independent of actual operating instructions, regarding the safe handling of firearms. Some of these are expressed in Exhibit E to the Firearm Seller's brief, which include the Bass Pro Shop 'Ten Commandments of Safe Gun Handling.' There is no disputed fact that Lewis signed and received this document and the information contained therein. Had he followed these admonitions, notwithstanding any alleged defect in failure to provide one or more safety devices, this tragic event would likely not have happened. This was not a firearm handed to Lewis; rather, it was one he had purchased, loaded, and kept in his vehicle. He was not engaged in the act of cleaning the firearm, which might have led to his assumption based on prior use of a Glock brand firearm that he needed to pull the trigger to dismantle the gun, but rather he was demonstrating his familiarity with its operation and his ability to dismantle it all in response to the question of whether or not he knew how to do so. Lewis was not asked to make the demonstration, but chose to do so for no apparent reason other than to prove that he could. All of which occurred while operating a motor vehicle with other occupants.

"Assessment of the risks by a reasonable person as required by our criminal code involves all the known risks. For this reason, the Court notes that the acts just described were accomplished following some type of concealed carry class, which Lewis did not formally complete, as well as his receipt of the operating manual for this firearm which he did not read based upon an assumption that he knew how to operate it because he had used other brands of firearms.

"During his attempted dismantling of the APX pistol, Lewis had it pointed directly at the plaintiff in violation of Commandment Number 1 in Firearm Sellers' Exhibit E. His conduct also violated several other commandments in Exhibit E as well. There is a reason why they are called 'commandments' and not merely guidelines to be followed. That is because of the inherent risks associated with the discharge of the firearm.

"Plaintiff suggests that statements about Lewis checking for a chambered cartridge demonstrate a genuine issue of material fact sufficient to avoid grant of summary judgment. His conduct in this regard is the result of three possible scenarios, all of which start with the fact that Lewis knew the firearm was loaded in discussing these scenarios. The first possible scenario is that Lewis failed to look for the chambered cartridge. The second possible scenario is that he looked, but failed to see the chambered

cartridge. And the third possible scenario is that he intended to fire the pistol; however, this last scenario can be disregarded because there is no evidence to support it.

"But notwithstanding either of the first two scenarios, the fact that the firearm discharged when he pulled the trigger is an undeniable fact. Whether he looked and did not see, or just did not look is truly immaterial to the fact that he pulled the trigger without any certainty as to whether a cartridge was in the chamber. In other words, neither of the first two scenarios make any difference to the outcome.

"In assessing recklessness, it must be remembered that Lewis did not read the operator's manual, which would have disclosed that there was no need to pull the trigger to dismantle the pistol, nor did Lewis heed the warning printed on the side of the firearm ['FIRES WITHOUT[] MAGAZINE'] or utilize the safety button ['Striker Deactivation Button'] which allowed the removal of the slide without the need to pull the trigger.

"The Court finds it is without question that Lewis consciously disregarded known, substantial, and unjustifiable risks arising from the circumstances apparent in this case. Similarly, there is no question that Lewis knew what possible result might follow if he mishandled a gun, especially given his claimed prior experience and training. The only real question that remains is whether his disregard for risk was a gross deviation from the standard of care. The Court finds, without hesitation, that it was for the reasons discussed above."

I agree with the district court's reasoning that Lewis' failure to learn how his gun operated before pointing it at Johnson and pulling the trigger was legally reckless. I do not believe reasonable minds could differ on whether Lewis consciously disregarded substantial and unjustifiable risks created by his conduct and his disregard was a gross deviation from the standard of care which a reasonable person would exercise. K.S.A. 21-5202(j). A jury would have no more evidence before it to decide this issue than the district court and, as the court explained, the only area of controversy is immaterial. As a result, I agree with its conclusion that Lewis' actions violated several criminal statutes which include recklessness as an element, such as battery, K.S.A. 21-5413(a); aggravated battery, K.S.A. 21-5413(b)(2)(A); unlawful discharge of a firearm in a city, K.S.A. 21-6308a(a); and endangerment, K.S.A. 21-5429(a).

29

That said, my disagreement with the majority over whether Lewis acted recklessly may ultimately be immaterial. The majority correctly found that Johnson's claimed damages arose from the criminal discharge of a firearm from a public roadway in violation of K.S.A. 2022 Supp. 21-6308(a)(3)(B), which is enough to consider Johnson's lawsuit to be a qualified civil liability action prohibited under the Act. 15 U.S.C. § 7902(a); 15 U.S.C. § 7903(4), (5)(A). Even so, I voice my disagreement with the majority's conclusion on the issue of Lewis' recklessness because I believe it encourages firearms users to turn a blind eye or remain ignorant to the risks inherent in handling those weapons, which would be a troubling result.

*The Act's product defect exception does not apply to Lewis' volitional actions.*

As the majority notes, a finding that Johnson's lawsuit is a qualified civil liability action does not end the inquiry. While the Act generally precludes such suits, it contains a limited exception for product defect claims like Johnson's. If a qualified civil liability action results "directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner," it is allowed to proceed unless "the discharge of the product was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v). I would answer the question of whether Lewis' conduct falls within this "exception to the exception" differently than the majority.

Since Lewis did not intend for the gun to discharge when he pulled the trigger, the majority finds the shooting was accidental and not a volitional act under 15 U.S.C. § 7903(5)(A)(v). But the Act does not say the *discharge* must be volitional—only the act causing the discharge must be volitional. No one claims Lewis accidentally pulled the trigger—they claim he accidentally discharged the gun.

While the *consequences* of pulling the trigger may have been accidental, Lewis' act of pulling the trigger was not. Since Lewis meant to pull the trigger—the action that

30

caused the discharge—I would find the discharge of the gun was caused by a volitional act. And because I agree that Lewis' discharge of the gun under these circumstances constituted a criminal act, I would find Johnson's claims are still barred by the Act.

I agree with the majority's reasoning that the *Travieso* and *Adames* cases are most like this case because they addressed accidental shootings that involved a person pulling the trigger of a gun. See *Travieso v. Glock Inc*., 526 F. Supp. 3d 533, 543 (D. Ariz. 2021); *Adames v. Sheahan*, 233 Ill. 2d 276, 280-82, 909 N.E.2d 742 (2009). And I find their reasoning in determining that the volitional act exception to the product defect exception applied in those situations to be persuasive.

As here, the plaintiff in *Adames* contended the shooting was not volitional because the shooter did not intend to fire the gun. Since the Act does not define "volitional" the Illinois Supreme Court looked to dictionary definitions. It noted Black's Law Dictionary defined the word "volition" as: "'1. The ability to make a choice or determine something. 2. The act of making a choice or determining something. 3. The choice or determination that someone makes.'" 233 Ill. 2d at 314 (quoting Black's Law Dictionary 1605 [8th ed. 2004]). And it noted Webster's defines "volition" as "'the act of willing or choosing: the act of deciding (as on a course of action or an end to be striven for): the exercise of the will'" and "volitional" as "'of, relating to, or of the nature of volition: possessing or exercising volition.'" 233 Ill. 2d at 314 (quoting Webster's Third New International Dictionary 2562 [1993]). Based on these definitions, the Illinois court found that even though the shooter did not intend the consequences of his act, his act was still volitional because the shooter chose to point the gun at the victim and chose to pull the trigger. 233 Ill. 2d at 314. Lewis acted the same way here.

Unlike the majority, I do not believe this interpretation "swallow[s] the product defect exception entirely." Slip op. at 18. The Act is designed to impose accountability on the user, not the manufacturer or seller, for criminal or unlawful use of the firearm.

Indeed, one of the purposes of the Act is: "To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1). While it carves out a limited exception for "death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product," it still requires the firearm to have been "used as intended or in a reasonably foreseeable manner" to qualify for the exception and it excludes actions "where the discharge of the product was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v). Thus, lawsuits seeking to redress injuries even in situations where the use of the firearm was criminal or unlawful are allowed if no one chose to pull the trigger. For example, in situations where a criminal only meant to waive a gun around during a crime or where someone unlawfully carried a gun into a prohibited place like a school or government building but it accidentally discharged without an intentional trigger pull due to a design or manufacturer defect. On the other hand, if we allow claims like Johnson's to proceed, we would open the door to suits against manufacturers and sellers for the exact type of behavior the Act was designed to prohibit.

I do not see the ambiguity in the volitional act exception to the product defect exception that the majority does. As such, I see no need to resort to canons of construction like the federal preemption doctrine which the majority uses to narrow the scope of this exception.

Like the majority, the *Travieso* plaintiff also relied on the federal preemption doctrine to advocate for a narrow interpretation of the scope of the Act. But the federal court in Arizona found the usefulness of this canon of construction to be limited in this situation:

32

"[U]nlike the federalism canon, the presumption against preemption is a *presumption*, *not a 'clear statement'* rule. It helps govern the Court's choice between two plausible constructions of a statute, but does not override the unambiguous intent of Congress as revealed by the text and framework of the law. *Altria Group, Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008) (applying the presumption against preemption 'when the text of a pre-emption clause is susceptible of more than one plausible reading'); see also *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005).

"Here the PLCAA contains a clear statement of Congress's intent to preempt the states. 28 U.S.C. § 3702. As such, the role of the Court is merely to construe the scope of that preemption in light of the congressional purpose of the statute as revealed by the text and statutory framework. *Altria Group*, 555 U.S. at 77; *Bates*, 544 U.S. at 449; *Medtronic*[*, Inc. v. Lohr*], 518 U.S. [470, ]485-86[, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)]; *Cipollone*[ *v. Liggett Group*], 505 U.S. [504, ]530 n.27[, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992)]; *Gade*[ *v. National Solid Wastes Management Ass'n*], 505 U.S. [88, ]111[, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)]. While the Court will factor the presumption against preemption of the states into its analysis, *Medtronic*, 518 U.S. at 485, 116 S. Ct. 2240, the presumption is merely one factor in the Court's analysis. It will not override the intended purpose of Congress revealed by the text and framework of the PLCAA. *Altria Group*, 555 U.S. at 77." *Travieso*, 526 F. Supp. 3d at 541.

In reviewing the text and framework of the Act, I would find a fair reading shows that Congress intended to exclude claims like Johnson's from the scope of the Act's product defect exception. The volitional act exception excludes situations were "the discharge of the product was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v). By requiring the discharge to be volitional, the majority's interpretation rearranges the Act's language by reading the word volitional to modify the word discharge. But that is not what the Act says: it is only the act—here, Lewis pulling the trigger with the gun pointed at Johnson—that must be volitional (and criminal). I therefore do not think the exclusion in this exception extends to an accidental discharge caused by a purposeful trigger pull. Whether Lewis intended the consequences

of his actions is irrelevant because he intended to take the actions that caused those consequences.

*Conclusion*

The responsibility for firearm safety rests at the feet of the user. Like other dangerous tools, blatant disregard of safety practices can have devastating consequences—like they did here. I fear the majority's decision erodes the individual responsibility mandate of firearm use and Congress' public policy choices which prompted the Act. Stretching the volitional act exception to include situations where the gun functioned as it was designed to perform when the user purposefully and here, criminally, pulled the trigger would abrogate the Act's purpose and the boundaries carefully drawn by the Act's language. I would affirm the district court's summary judgment decision finding Johnson's claim is barred by the Act.